**2020 WI App 34**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:        2018AP2220-CR

†Petition for Review filed

Complete Title of Case:


**STATE OF WISCONSIN,**

　　　**†PLAINTIFF-APPELLANT,**

　　**V.**

**ADAM W. VICE,**

　　**DEFENDANT-RESPONDENT.**


| | |
|---|---|
| Opinion Filed: | May 19, 2020 |
| Submitted on Briefs: | January 21, 2020 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Seidl, JJ. |
| Concurred: | |
| Dissented: | Hruz, J. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Joshua L. Kaul*, attorney general, and *Jennifer R. Remington*, assistant attorney general. |
| Respondent ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of *Frederick A. Bechtold*, Taylors Falls, Minnesota. |

**COURT OF APPEALS
DECISION
DATED AND FILED**

**May 19, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| Appeal No. **2018AP2220-CR** | Cir. Ct. No. **2014CF162** |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS** |

STATE OF WISCONSIN,

    PLAINTIFF-APPELLANT,

  V.

ADAM W. VICE,

    DEFENDANT-RESPONDENT.

APPEAL from an order of the circuit court for Washburn County: JOHN P. ANDERSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1 STARK, P.J. This case—which is before us for the second time—requires us to determine whether the circuit court properly granted Adam Vice's motion to suppress his confession to sexually assaulting a four-year-old girl. Vice confessed during an interview that occurred after he failed a polygraph examination. In a previous opinion, we reversed an order suppressing Vice's confession and

remanded for the circuit court to make additional findings of fact as to whether the confession was voluntary. On remand, the court determined Vice's confession was not voluntary and again granted his suppression motion. The court also addressed—and appeared to agree with—Vice's assertion that his confession should be suppressed because the polygraph examination and post-polygraph interview were not discrete events.

¶2 The State now appeals, arguing the totality of the circumstances establishes that Vice's confession was voluntary. The State also contends we should not consider Vice's argument that the polygraph examination and post-polygraph interview were not discrete events because Vice previously conceded that they were discrete events. In the alternative, the State argues the record establishes that the polygraph examination and post-polygraph interview were discrete events.

¶3 Because both Vice and the State have briefed the issue and because the circuit court considered it, we exercise our discretion to address Vice's argument that the polygraph examination and post-polygraph interview were not discrete events. We reject Vice's argument in that regard. Based on the totality of the circumstances, however, we agree with Vice that his confession during the post-polygraph interview was not voluntary. We therefore affirm the order granting Vice's motion to suppress his confession.

## BACKGROUND

¶4 In December 2014, police received a report that a four-year-old girl had been sexually assaulted by Vice, a friend of the girl's family. The victim reported that Vice inserted his finger into her anus and vagina and had attempted to lick her "privates." The assault was alleged to have occurred in October 2014 at a home where Vice lived with the victim's mother and others.

¶5 On December 11, 2014, Vice voluntarily underwent a polygraph examination regarding the alleged assault, which the examiner concluded he failed. During a recorded interview with two detectives following the polygraph examination, Vice confessed to sexually assaulting the victim. Vice later moved to suppress his confession, arguing it was involuntary because the detectives "repeatedly told [him] he failed the polygraph examination before getting the statement they wanted."

¶6 At the suppression hearing, Washburn County Sheriff's Department investigator William Fisher testified he had interviewed Vice at his workplace in December 2014 regarding the sexual assault allegations. During the interview, Vice denied any wrongdoing and asked Fisher if there was anything he could do to clear his name. Fisher suggested that Vice take a polygraph test, and Vice agreed to do so.

¶7 Fisher subsequently arranged for detective Ryan Lambeseder of the Eau Claire Police Department to conduct a polygraph examination of Vice. Because Vice had no way of independently getting to Eau Claire, Fisher drove him there from Rice Lake. Vice sat in the front passenger seat of Fisher's vehicle and was not handcuffed. On the way to Eau Claire, Fisher reminded Vice that he did not have to take the polygraph test, and Vice responded that he wanted to clear his name.

¶8 When Fisher and Vice arrived at the Eau Claire Police Department, Lambeseder escorted Vice into the room where the polygraph examination would be conducted, and Fisher watched from an observation room. Lambeseder testified that before he began the polygraph examination, he read two forms aloud to Vice: a

form waiving Vice's ***Miranda***[1] rights and a polygraph examination consent form. Vice did not have any questions and signed both forms.

¶9 Lambeseder then conducted a "pretest," which involved asking Vice questions about his background and recording Vice's responses on a "polygraph examination data sheet." In response to Lambeseder's questions, Vice indicated that he had not taken a previous polygraph examination; his physical condition was average; he had not had any major injuries or surgeries in the last six months; he was not in any discomfort; he had eaten during the previous twenty-four hours; he went to bed at 10:30 p.m. the prior evening and slept until 7 a.m.; he "slept fair"; he had never been treated by a psychiatrist or psychologist, nor had he been a patient in a mental hospital; he did not have heart disease, any communicable diseases, high or low blood pressure, seizures, hearing loss, or back issues; and he had not consumed alcohol in the last twenty-four hours or illegal drugs in the last forty-eight hours. Based on this information, Lambeseder concluded Vice was "fit to test." Lambeseder also ascertained that Vice had completed high school.

¶10 Lambeseder then conducted the polygraph examination, which took about one hour and forty-five minutes. During the examination, Vice denied any sexual misconduct involving the victim. After the examination was completed, Vice again signed the polygraph examination consent form, which stated the examination "was concluded at 11:40 am." Lambeseder then escorted Vice to a different interview room, where Vice was left alone for ten to fifteen minutes while Lambeseder scored the examination and informed Fisher of the results.

---

[1] *See **Miranda v. Arizona***, 384 U.S. 436 (1966).

4

¶11    Fisher and Lambeseder subsequently returned to the interview room where Vice had been waiting and conducted a post-polygraph interview. Vice was not handcuffed during the interview. The interview room was an "average temperature," was small, and had no windows. The room contained a square interview table that was pushed against one wall. Vice was seated in the corner of the room located farthest from the door. Fisher was seated across the table from Vice, and Lambeseder was seated at the side of the table located to Fisher's left. Vice would have had to walk past both officers to leave the interview room.

¶12    The post-polygraph interview was video recorded, and the circuit court viewed the recording before ruling on Vice's suppression motion.[2] Immediately after the detectives entered the interview room, Lambeseder asked Vice how he thought he did on the polygraph examination. Vice responded, "I don't know. I know for a fact that I'm telling the truth when I was telling the truth." Lambeseder then informed Vice that he had not passed the examination, and he further stated that on the questions regarding the victim, it was "very clear" Vice was not telling the truth.

¶13    Lambeseder continued:

> And so that's where, Adam, we want to talk about that, okay? We want you to—this has been weighing on you, and I can tell. And I can tell on that exam, okay? In fact, I can tell on your face it's been weighing on you. And I understand that, okay? It would—something like that would weigh on me, but—okay? But now is the time let's talk like

---

[2] The parties stipulated during the suppression hearing that the recording of Vice's post-polygraph interview was a fair and accurate depiction of the interview. In addition to the recording, the appellate record also contains a transcript of the post-polygraph interview. The parties have relied on that transcript when providing quotations from the post-polygraph interview, and we do the same.

> men. Let's get it out there. And let's figure out, you know, just where we need to go from here, okay?

Vice responded:

> I'll be honest. … 100 percent honest and I'll take that test again. I do not remember doing this. I honestly do … and I will take the test, but …—but—but obviously I failed the test. Something's wrong. Is there a way or is it any possibility that I—somehow I blacked out and not remember this? … Because right now I feel like I'm having a heart attack.

Lambeseder replied, "You do remember doing it, otherwise you wouldn't react the way you did on the exam, okay?"

¶14     For approximately the first eight minutes of the post-polygraph interview, Vice consistently asserted that he did not remember assaulting the victim. During that time, however, Fisher and Lambeseder repeatedly asserted that Vice's performance on the polygraph examination showed he remembered the assault because he would not have reacted the way he did during the examination if he did not remember. The detectives also emphasized that it was important for Vice to tell the truth so that they could determine whether Vice was "the guy who is going to do this to every little kid he comes in contact with" or "the guy who made a mistake, made a poor choice, and we need to deal with that appropriately as opposed to the guy who is going to do this to everybody."

¶15     Fisher ultimately stated that if Vice did not take responsibility for his actions, the district attorney and judge would think he was dangerous and that other children in the community needed to be protected from him. Conversely, "if it's an isolated mistake, you know, because just circumstances being what they were at that time, then they can deal with that. You know, and they can say okay, we can allow him to be in the community." Lambeseder then inquired, "Can you do that for us

right now?" and asked Vice to "[b]e truthful." At that point—about eight minutes after the interview began and after the officers had referenced the failed polygraph seven or eight times—Vice made his first admission to the sexual assault, stating, "It's going to sound really shitty for me to say this right now, but I sexually assaulted [the victim]."

¶16 Despite having admitted that he had sexually assaulted the victim, Vice continued to vehemently deny having any memory of the assault. After Vice's initial admission, Lambeseder asked whether Vice could "explain what [he] did," and Vice responded, "No. I cannot. I honestly can't." Vice continued, "I never fucking remember. I—my whole body's reacting to it. Why can't I fucking remember?" Vice then told the detectives he felt like he was going to throw up and again asserted he did not remember the assault. He further asserted he did not know when the assault had happened. Lambeseder replied that it did not matter when the assault occurred, and Vice just needed to explain why it happened and "what was in [his] head." Vice responded, "I don't know. I honestly don't know. I don't know if I was drunk. I don't know if I was—I honestly don't know, and it's scaring me."

¶17 The detectives continued to insist that Vice remembered assaulting the victim and that he needed to explain what happened so that the judge and district attorney could "have an understanding." Vice responded, "I would tell you if I knew, but I … I'll admit that I must have did it because obviously the test says that I did it, but I don't physically remember." The detectives did not respond to Vice's statement that because he had failed the polygraph test, he must have sexually assaulted the victim.

¶18 Vice continued to assert that he "honestly [could not] remember" the assault. Fisher ultimately told Vice that saying he did not remember would not help

7

him "because we can't have people running around doing things they can't remember and aren't responsible for." Lambeseder then referenced the polygraph examination again, telling Vice, "It shows on the test that you remember." Fisher reinforced that assertion, stating, "We have this girl, you know, in her—her interview, I mean, physically demonstrating, describing, naming you. I mean, it happened. You remember it happening." When Vice responded, "But I don't know if I actually…," Fisher interrupted him, stating that by saying he did not remember, Vice was not taking responsibility for his actions.

¶19 Fisher continued to emphasize that Vice needed to tell the detectives the truth. Vice responded:

> But I—I don't know what I did. I honestly don't. I don't know if I took off her clothes, if she was in her underwear, if I tried licking her over her pants or her underwear, if I actually touched her, or if I took my pants off—

Lambeseder interrupted Vice again, stating, "You remember. You do remember, so you just got to tell us about it."

¶20 Lambeseder then asked whether it would be easier if the officers asked Vice direct questions about what he had done, and Vice responded, "Possibly." The following exchange then occurred, after Vice had spent approximately an additional six and one-half minutes asserting that he did not remember assaulting the victim:

> [Fisher:] … Did you take your fingers and place them in— or underneath her—[the victim's] underwear on—directly on her vagina?
>
> [Vice:] Yes.
>
> [Lambeseder:] You're recalling that now?
>
> [Vice:] Sort of.
>
> [Lambeseder:] Okay.

8

[Vice:] Like I see myself going, like, with just one finger going through her front and going like this (indicating).

[Lambeseder:] Okay.

[Fisher:] Sure. You remember that?

[Vice:] I think, yes.

[Fisher:] I mean, you do. You just described it and—and that's what happened, right?

[Vice:] Yes.

¶21 Vice denied remembering when the events he had just described occurred, but he stated, "It had to be in October." When asked where they occurred, he responded, "I must—downstairs in the big living room when she was on the bed. She was on the right-hand side." He expressed confusion, however, about where the victim's sister would have been during the alleged assault.

¶22 Fisher next asked whether Vice tried to lick the victim's vagina, and Vice initially responded, "I don't know. I don't think so. I'm trying—[.]" Lambeseder then asked, "Did you try to pull down her pants to do that?" Vice replied, "I think I tried just pulling on her pants so I could get my hand down her pants a little easier. Oh, God. I'm sick." The detectives then assured Vice that the only way for him to "get help" was by "admit[ting] [his] mistakes."

¶23 In response to additional direct questions from the detectives, Vice stated: (1) he knew "for a fact" that he did not pull down his pants and take out his penis; (2) he tried to lick the victim's crotch, but he "couldn't through her pants"; (3) he took off the victim's pants, but he did not try to lick her crotch over her underwear; (4) he stuck his hand inside the victim's underwear; and (5) he did not remember touching the victim's buttocks, but he may have done so incidentally when he was "trying to get [his] hand down her front side." Lambeseder then asked

9

Vice to describe his thoughts at the time of the assault, and Vice again stated he did not know. The detectives continued pressing Vice, who denied that he was sexually aroused at the time of the assault. However, Vice subsequently answered in the affirmative when Lambeseder asked if he had touched the victim out of "sexual excitement" or a "[d]esperation-type thing."

¶24 Fisher then made another reference to the polygraph examination, telling Vice that Lambeseder had "been … working with the polygraph things and we've been interviewing people. We know the techniques people use, you know, to try, you know, not remembering or it was their fault." Thereafter, Vice suggested that perhaps he could not remember the assault because he had been drinking, stating: "I don't drink that often, but when I do, I do. And I play a lot of video games while drunk, and I don't remember all the rest of the night." Fisher responded, "But you do remember that"—i.e., the assault—and Vice stated, "Vaguely." Lambeseder then interjected, "It's clear to you because you … showed you did on the test, okay?" Vice again responded, "Vaguely." Fisher continued, "But you know what happened. You just described part …." Vice replied, "That is—that is literally all I can remember."

¶25 Upon further questioning by the detectives, Vice continued to assert that he had little memory of the night in question, stating, "Like I said, only thing I remember is coming home, playing video games, and drinking, and vaguely remember going into the other room. Pretty much like a dream at this point in time. That's how fuzzy it is." When Lambeseder suggested Vice was trying to block out memories of a mistake, Vice continued:

> But that's—that's all I remember is what I said, going to the
> other room—it's just fuzzy as hell. Staggering around. I
> don't remember the other girl being in there. I don't even
> know what time it was. Or why [the victim] didn't scream

10

or something like that. Or why anybody else didn't see me. But I don't remember falling asleep. I don't remember waking up. I don't remember anything.

Vice later conceded that he had "vague memories of doing the things I said I did," but he described those memories as being "like a dream" or like déjà vu.

¶26     Toward the end of the interview, Vice reaffirmed in response to the officers' questions that he had touched the victim's buttocks over her underwear while his other hand was inside her underwear. He also reaffirmed that he had tried to lick her vagina, and when he could not do so, he removed her pants. It is undisputed that Vice was never informed—either before or during the post-polygraph interview—that the results of a polygraph examination are inadmissible in court.

¶27     Both officers testified at the suppression hearing that Vice appeared to understand the questions they asked him and provided responsive answers to those questions. The officers further testified that they spoke to Vice in a nonconfrontational tone, they did not yell at him, and they did not make any threats or inducements to secure his confession.

¶28     Vice testified at the suppression hearing that he had taken special education classes "[a]ll through high school." In addition, he had long-standing diagnoses of Attention Deficit/Hyperactivity Disorder (ADHD), depression, and anxiety. Vice testified he felt "really nervous" during the polygraph examination and explained, "I was told that I couldn't move, and when I'm told I'm not supposed to do something, like hold still, I can't help but shake and try to control … I try to control my breathing, and I just tense up and freak out."

11

¶29    Vice also testified he was "nervous" when left alone in the interview room following the polygraph examination. When the post-polygraph interview began, no one told Vice he was free to leave, and he did not believe he could do so. When the officers told Vice he had failed the polygraph test, he testified his "heart dropped" and he could not believe he had failed the test because he "honestly … didn't do it." Vice testified he was afraid of being arrested, he had no way of communicating with anyone, and he had no way of getting home other than getting a ride from one of the officers.

¶30    Vice further testified that he confessed to assaulting the victim only after the officers repeatedly told him that he had done so and implied that things would go better for him if he confessed. When asked whether he felt the officers treated him fairly, Vice responded, "To a point." He then clarified:

> Just the way they positioned just made me feel very uneasy. I'm sure they were talking in a nice tone of voice, average tone of voice, but I just—if I felt there was an emergency and I had to get out of there, I would have to literally jump over two armed people.

¶31    The circuit court granted Vice's motion to suppress his confession. The court reasoned the record was "absolutely clear in this case that the State made a number of references to a failed polygraph at both times, and under certain circumstances, they created a coercive environment." The court therefore concluded suppression of Vice's confession was warranted under *State v. Davis*, 2008 WI 71, 310 Wis. 2d 583, 751 N.W.2d 332, and *State v. Johnson*, 193 Wis. 2d 382, 535 N.W.2d 441 (Ct. App. 1995).

¶32    The State subsequently appealed from the order granting Vice's suppression motion. *See* WIS. STAT. § 974.05(1)(d)3. (2017-18) (permitting the

12

State to appeal from an order suppressing a confession or admission).[3] On appeal, we refused to address Vice's argument that suppression of his confession was warranted because the polygraph examination and post-polygraph interview were not discrete events. *See State v. Vice*, No. 2015AP2558-CR, unpublished slip op. ¶21 (WI App Sept. 13, 2016). Not only was that argument raised for the first time on appeal, but Vice had actually conceded in the circuit court that the polygraph and post-polygraph interview were discrete events. *Id.* We therefore determined Vice was "judicially estopped from arguing to the contrary on appeal." *Id.*

¶33 Next, we observed that while the circuit court had concluded Vice's confession was involuntary, the basis for that conclusion was "unclear" because the court's decision could be read as holding either "that the detectives' references to the polygraph examination while questioning Vice automatically rendered his confession involuntary" or that the confession "was involuntary based on the totality of the circumstances, including the references to the polygraph examination." *Id.*, ¶23. We held, "[T]o the extent the circuit court concluded suppression of Vice's confession was required solely because the detectives referred to his failed polygraph examination when questioning him, that conclusion was erroneous." *Id.*, ¶26. Alternatively, to the extent the court concluded Vice's confession was involuntary under the totality of the circumstances, we concluded the court did not make any factual findings in support of that conclusion. *Id.*, ¶27. We therefore reversed and remanded for the court "to engage in additional fact-finding and to determine, based on those facts, whether Vice's confession was voluntary." *Id.*, ¶29.

---

[3] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

13

¶34 On remand, the parties stipulated that no additional testimony from Lambeseder or Fisher was required. In addition, Vice obtained new counsel on remand, who argued his former attorney had incorrectly conceded that the polygraph examination and post-polygraph interview were discrete events. During its oral ruling on remand, the circuit court stated it was "a little concerned that the defense may have prematurely conceded the point that the post-polygraph interview was wholly discrete and separate from the polygraph test." The court stated, however, that it was "compelled to accept the Court of Appeals' decision" that Vice had conceded the polygraph and post-polygraph interview were separate events.

¶35 Nevertheless, the circuit court made several factual findings regarding that issue, in case "the Court of Appeals in the future is willing or able to reconsider" it. First, the court found that the officer who conducted the polygraph examination had also participated in the post-polygraph interview. Second, the court found that the "location of the interview was the same building as the polygraph but in a different room." Third, the court found that "[t]he time between the polygraph in one room and the interview in another room is close and … appears to be … minutes apart but not more than that." Fourth, the court found there were "at least 11 separate references to the polygraph test during the interview." Fifth, the court stated that one of those references "led [Vice], perhaps, to misunderstand what a polygraph test establishes in that regard" and instead to believe that "the polygraph said I did it so it must be true." Sixth, the court found that Vice's *Miranda* rights "were discussed before the polygraph but not before the post-polygraph interview." Seventh, the court found that Vice was never informed "that the polygraph was not admissible in court but any statement could be." On these facts, the court stated there was "at least a viable argument that the polygraph was not a distinct or discrete event from the interview."

¶36 Turning to the voluntariness of Vice's confession, the circuit court concluded the totality of the circumstances established that Vice's confession was involuntary. In support of that determination, the court reiterated that the polygraph examiner had "participated directly" in the post-polygraph interview and that the officers referred to the polygraph "at least 11 times" during the interview. In particular, the court noted that the polygraph "was referenced almost immediately when the interview started and [the officers] indicated that he failed the test; and because he failed the test, he must remember the sexual assault." The court further observed that Vice himself had referred to the test "as being proof that he committed a sexual assault[,] and his conclusion was never challenged or corrected in any way." The court also stated the test results "were used over and over again to elicit a statement." In addition, the court again observed that although Vice had received *Miranda* warnings before the polygraph test, he did not receive the same information a second time before the post-polygraph interview.

¶37 As for Vice's personal characteristics, the circuit court noted that Vice was in his mid-twenties at the time of the interview, had "little or marginal prior contacts with law enforcement," and had finished high school but had "a history of special education." The court stated it appeared Vice was competent and could "reasonably understand the seriousness of the events," but he was "by no means sophisticated or wily in the operation of the criminal justice system."

¶38 The circuit court next commented on Vice's demeanor during the interview, stating Vice appeared "distraught with the news that he failed [the polygraph examination], nearly crying at times." The court also noted that Vice "got to the point that he was apparently physically sick and indicated that [to the officers]." Based on those factors, the court stated it was "satisfied that it does

15

appear that to one extent or another, his physical state at times appeared to be compromised to a certain degree."

¶39 Ultimately, the circuit court concluded that

> the overt reference in this case to the polygraph test on multiple occasions with the actual polygraph examiner in the room and the use of clearly misleading information regarding the test without the benefit of telling the defendant the test would not be admissible in court together with the defendant drawing clearly erroneous conclusions; in other words, the test says I did it or words to that effect, had a tendency to create a certain coercive atmosphere.

While the court conceded that law enforcement officers are "not required, necessarily, to always be truthful in an interview," it reasoned that "when the examiner of a polygraph is there and perhaps information about what the polygraph may or may not mean is also given, that begins to have an impact … on the voluntariness of the statement."

¶40 The circuit court acknowledged that the post-polygraph interview lasted only forty-five minutes, which was "not terribly long, but [not] exactly short, either." The court also acknowledged that the interview room "wasn't apparently uncomfortable" and that Vice was not "restrained or physically abused." The court further observed that Vice "voluntarily went to the test site," and there was no indication that any "coercion" occurred during the ride to or from the police station. Nonetheless, the court concluded the totality of the circumstances demonstrated that Vice's "ability to reasonably overcome the efforts by the State to elicit a statement [was] simply overwhelmed by the somewhat coercive pressuring nature of the overt references to the failed test and the examiner's participation in that." The court therefore held that Vice's confession was not voluntary and again granted Vice's motion to suppress. The State now appeals.

## DISCUSSION

¶41     Our review of an order granting a motion to suppress presents a mixed question of fact and law. *State v. Casarez*, 2008 WI App 166, ¶9, 314 Wis. 2d 661, 762 N.W.2d 385. We uphold the circuit court's findings of historical fact unless they are clearly erroneous, but the application of the law to those facts is a question of law that we review independently. *Id.*

¶42     In this case, the circuit court granted Vice's motion to suppress his confession to sexually assaulting the victim, which was made during a post-polygraph interview with law enforcement. The results of polygraph examinations are inadmissible in criminal proceedings, as are any statements a defendant makes during a polygraph examination. *State v. Greer*, 2003 WI App 112, ¶9, 265 Wis. 2d 463, 666 N.W.2d 518; *see also* WIS. STAT. § 905.065(1)-(2). Statements made after the examination is over, however, are admissible as long as certain requirements are met. *Greer*, 265 Wis. 2d 463, ¶9.

¶43     We apply a two-step test to determine the admissibility of statements made following a polygraph examination. *See Davis*, 310 Wis. 2d 583, ¶2.[4] First, we consider whether the statements are so closely associated with the polygraph examination that the examination and statements are one event, rather than two discrete events. *Id.* If so, the statements must be suppressed. *Id.* If we instead conclude that the examination and statements are two discrete events, we then

---

[4] *State v. Davis*, 2008 WI 71, ¶2, 310 Wis. 2d 583, 751 N.W.2d 332, considered the admissibility of statements made following a voice stress analysis, rather than a polygraph examination. The court stated, however, that it saw "no reason … to treat these two methods of 'honesty testing' differently." *Id.*, ¶20. We therefore apply the framework set forth in *Davis* when analyzing the admissibility of Vice's post-polygraph statements.

consider whether the statements "survive constitutional due process considerations of voluntariness." *Id.*

## I. Discrete events

¶44 In Vice's prior appeal, we concluded Vice was judicially estopped from arguing that his confession should be suppressed under the discrete events prong of the *Davis* test because he had conceded in the circuit court that the polygraph examination and post-polygraph interview were discrete events. *See Vice*, No. 2015AP2558-CR, ¶¶20-21. The State contends that, in this appeal, "Vice should again be held to that concession," and we should therefore decline to consider the merits of his argument that the polygraph examination and post-polygraph interview were not discrete events.

¶45 The doctrine of judicial estoppel "precludes a party from asserting a position in a legal proceeding and then subsequently asserting an inconsistent position." *State v. Petty*, 201 Wis. 2d 337, 347, 548 N.W.2d 817 (1996). In addition, "[t]he law of the case doctrine is a 'longstanding rule that a decision on a legal issue by an appellate court establishes the law of the case, which must be followed in all subsequent proceedings in the trial court or on later appeal.'" *State v. Stuart*, 2003 WI 73, ¶23, 262 Wis. 2d 620, 664 N.W.2d 82 (citation omitted). Neither of these doctrines, however, is absolute. When the elements of judicial estoppel have been met, whether to apply the doctrine in a given case is a discretionary determination. *See Olson v. Darlington Mut. Ins. Co.*, 2006 WI App 204, ¶3, 296 Wis. 2d 716, 723 N.W.2d 713. We may also decline to apply the law of the case doctrine when we determine there are cogent, substantial, and proper reasons not to apply it. *See Stuart*, 262 Wis. 2d 620, ¶24.

¶46 In this case, we exercise our discretion to address Vice's argument that the polygraph examination and post-polygraph interview were not discrete events, despite Vice's prior concession to the contrary and despite our refusal to address the issue in Vice's previous appeal. On remand following Vice's previous appeal, Vice obtained a new attorney who argued his prior attorney had erred by conceding that the polygraph and post-polygraph interview were discrete events. The circuit court refused to rule on that issue, stating it was "compelled to accept the Court of Appeals' decision" that Vice was judicially estopped from raising it. Nevertheless, the court directly considered the issue and made a number of express factual findings related to it. Moreover, both parties have briefed the issue in Vice's present appeal. Under these circumstances, we conclude it is appropriate to address the merits of Vice's argument that the polygraph and post-polygraph interview were not discrete events.

¶47 When analyzing whether a polygraph examination and a post-polygraph interview are discrete events, we consider whether the defendant's statements during the interview are "so closely associated" with the polygraph examination that the examination and statements are "one event" rather than two. *Davis*, 310 Wis. 2d 583, ¶¶2, 21, 23. "Whether a statement is considered part of the [polygraph examination] or a totally discrete event is largely dependent upon whether the [examination] is over at the time the statement is given and the defendant knows the [examination] is over." *Id.*, ¶23. To make this determination, a court should consider:

> (1) whether the defendant was told the [examination] was over; (2) whether any time passed between the [examination] and the defendant's statement; (3) whether the officer conducting the [examination] differed from the officer who took the statement; (4) whether the location where the [examination] was conducted differed from where the

statement was given; and (5) whether the [examination] was referred to when obtaining a statement from the defendant.

*Id.*

¶48    Applying these factors in the instant case, we conclude Vice's polygraph examination and post-polygraph interview were discrete events.  First, Vice was informed—by virtue of the polygraph examination consent form that he signed following the examination—that the examination "was concluded at 11:40 am."  The form further stated, "I … understand that any questions I may be asked after this point in time, and any answers that I may give to those questions, are not part of the polygraph examination."  In addition, immediately after Fisher and Lambeseder entered the interview room to conduct the post-polygraph interview, Lambeseder asked Vice, "Well, how do you think you did?"  That question would have caused a reasonable person in Vice's position to infer that the polygraph examination had already ended.  Furthermore, after Lambeseder informed Vice that he had failed the polygraph, Vice offered to take the test again.  That offer gives rise to a reasonable inference that Vice understood the polygraph examination he had taken that morning was over.

¶49    Second, both Lambeseder and Fisher testified that ten to fifteen minutes elapsed between the end of the polygraph examination and the beginning of the post-polygraph interview.  Thus, a distinct break occurred between the examination and interview.  Although a ten-to-fifteen-minute break is not particularly lengthy, our supreme court concluded in ***Davis*** that a voice stress analysis and subsequent interview were separate events even though "very little time passed" between them.  ***Id.***, ¶31.

¶50 Third, although Lambeseder was involved in both the polygraph examination and the post-polygraph interview, the interview also included a second officer—Fisher—who had not participated in the polygraph examination. Moreover, the fact that Lambeseder participated in both the examination and the interview—in and of itself—is insufficient to demonstrate that the examination and interview were not discrete events. "[P]recedent clearly holds that the same officer may conduct both the examination and the interview so long as the two events are separate." *Id.*, ¶33.

¶51 Fourth, the polygraph examination and post-polygraph interview took place in different rooms. Although the circuit court observed that both rooms were located within the same building, neither the court nor Vice has cited any authority suggesting that a polygraph examination and post-polygraph interview must be conducted in separate buildings in order to constitute discrete events. Notably, the voice stress analysis and subsequent interview in *Davis* took place in different rooms within the same police station, and our supreme court nevertheless concluded they were discrete events. *Id.*, ¶¶7-11.

¶52 Fifth, it is true that Fisher and Lambeseder referred to the polygraph examination repeatedly during the post-polygraph interview. However, we have previously stated that

> as long as there is both a sufficient temporal separation and a sufficient spatial demarcation between the examination and the post-examination interview, and the defendant is told that the polygraph test is over, letting the defendant know that he or she did not pass the examination, or letting the defendant so conclude, does not negate that the examination and the post-examination interview are … "totally discrete" events rather than "one event."

*Greer*, 265 Wis. 2d 463, ¶16 (citation omitted).

21

¶53     In summary, the undisputed facts of this case show that: Vice signed a form stating that the polygraph examination was over and that any subsequent questions were not part of the polygraph examination; the examination and post-polygraph interview took place in different rooms; ten to fifteen minutes elapsed between the examination and interview; and the interview involved a second officer who did not participate in the polygraph examination. Under these circumstances, we cannot conclude Vice's statements during the interview were "so closely associated" with the polygraph examination that the examination and interview were "one event" rather than two. *See Davis*, 310 Wis. 2d 582, ¶23. We therefore reject Vice's argument that suppression of his confession was warranted under the "discrete events" prong of the *Davis* analysis.

## II. Constitutional voluntariness

¶54     As noted above, even if a polygraph examination and post-polygraph interview are discrete events, statements made during the interview "must also survive constitutional due process considerations of voluntariness." *Id.*, ¶2. A defendant's statement is voluntary if it is "the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *Id.*, ¶36.

¶55     To determine whether a statement was voluntary, we apply a "totality of the circumstances standard," which requires us to "balance the personal characteristics of the defendant, such as age, education, intelligence, physical or emotional condition, and prior experience with law enforcement, with the possible pressures that law enforcement could impose." *Id.*, ¶37. Possible pressures include "the length of questioning, general conditions or circumstances in which the

statement was taken, whether any excessive physical or psychological pressure was used, and whether any inducements, threats, methods, or strategies were utilized in order to elicit a statement from the defendant." *Id.* "Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness." *State v. Hoppe*, 2003 WI 43, ¶37, 261 Wis. 2d 294, 661 N.W.2d 407. "If neither coercion nor other improper conduct was used to secure the statement, it is deemed voluntary." *Davis*, 310 Wis. 2d 583, ¶36.

¶56 Determining the voluntariness of Vice's confession presents a close case. In many ways, the circumstances surrounding Vice's confession are similar to the circumstances presented in *Davis*, where our supreme court concluded the defendant's confession was voluntary. Davis was accused of sexually assaulting a juvenile. *Id.*, ¶4. He voluntarily spoke with an officer regarding the assault first at his residence and later at the police station. *Id.* During the interview at the police station, Davis offered to take a polygraph test. *Id.* The officer later followed up with Davis, who agreed to return to the police station to take a polygraph test or voice stress analysis test. *Id.*, ¶5.

¶57 Although Davis planned to drive himself to the police station for the test, his car broke down on the way, and he ultimately received a ride from the officer. *Id.*, ¶¶5-6. When they arrived at the police station, the officer escorted Davis to an interview room, and a second officer then moved Davis to a family room where he performed the voice stress analysis. *Id.*, ¶8. After the test, Davis was returned to the interview room. *Id.*, ¶9. The testing officer told the first officer that the results indicated Davis had been deceptive, and both officers then retrieved Davis from the interview room and brought him back to the family room. *Id.*

23

¶58    The testing officer then "told Davis that his answers were deemed deceptive and showed Davis the results from the computer charts." *Id.*, ¶10. In response, Davis repeatedly said that he "did not do anything." *Id.* The testing officer challenged Davis's denial and asked Davis if he wanted to talk about the allegations. *Id.* Davis confirmed that he did and indicated he would prefer to speak to the first officer. *Id.* The testing officer then left the room, and the first officer took Davis back to the interview room. *Id.*, ¶¶10-11. Davis then gave a statement, in which he admitted the sexual assault allegations. *Id.*, ¶11.

¶59    As noted above, our supreme court concluded Davis's confession was voluntary. The court first observed that the record contained "no evidence that would give rise to any concerns regarding [Davis's] personal characteristics." *Id.*, ¶38. Davis was forty-three years old, and while he had only a middle-school education, the supreme court deferred to the circuit court's judgment that Davis "was not at such an educational disadvantage to render his personal characteristics at issue." *Id.* The court also observed that Davis's interview with law enforcement was not "lengthy," and his participation "was voluntary in every way." *Id.*, ¶¶39-40.

¶60    Similar considerations are present in this case. Vice was in his mid-twenties at the time he confessed to assaulting the victim. Although he had participated in special education classes, he had successfully completed high school. The interview during which Vice confessed lasted approximately forty-five minutes, which is similar to the approximately forty-minute interview in *Davis*. *See id.*, ¶11. And like Davis, Vice went to the police station voluntarily and voluntarily participated in the polygraph examination. In addition, Vice was not restrained during the post-polygraph interview, nor was he informed that he was under arrest. The officers spoke to him in a nonconfrontational tone, and they did not yell at or

threaten him. Although Vice testified to being nervous during and after the polygraph examination, he was able to understand and respond to the officers' questions. On these facts, neither Vice's personal characteristics nor the circumstances surrounding the interview convince us that Vice's confession was involuntary.[5]

¶61 Ultimately, however, we do conclude that Vice's confession was involuntary, based on a combination of several factors that, taken together, rendered the post-polygraph interview unduly coercive. First, as the circuit court noted, the officers in this case referred to the results of the polygraph examination at least eleven times during the forty-five-minute post-polygraph interview.

¶62 To be sure, an isolated reference to polygraph results during a post-polygraph interview does not—standing alone—render a defendant's confession involuntary. In ***Davis***, for instance, our supreme court rejected Davis's argument that his confession was involuntary because the officer who performed the voice stress analysis informed Davis he had failed that test and "referred to that information to 'undermine [Davis's] will to resist the official accusation.'" ***Davis***,

---

[5] Vice testified at the suppression hearing that officers' location in the interview room made him "uneasy" because he would have had to "jump over two armed people" to leave the room in the event of an emergency. This factor does not weigh heavily in our determination regarding the voluntariness of Vice's confession. Notably, Lambeseder testified it is standard practice for the person being interviewed to be placed on the side of the room away from the door, both for "safety reasons" and because of the angle of the camera in the interview room.

Vice also testified at the suppression hearing that he had long-standing diagnoses of ADHD, depression, and anxiety. He did not, however, inform the officers of those diagnoses. Moreover, Vice signed the polygraph examination consent form, which stated: "I am in good mental and physical condition and I know of no mental or physical ailment which might be impaired by the examination." On these facts, Vice's assertion that he suffers from ADHD, depression, and anxiety does not weigh heavily in favor of a conclusion that his confession was involuntary.

310 Wis. 2d 583, ¶41. The court observed, "In a very brief amount of time, Davis was told that the analysis indicated Davis was being deceptive, he was asked a question regarding his truthfulness, he was asked if he wanted to talk, and Davis said that he wished to speak with [one of the officers]." *Id.* On these facts, the court concluded no "coercive measures" were used to elicit Davis's confession. *Id.*, ¶42.

¶63    The *Davis* court acknowledged, however, that "[a]n important inquiry continues to be whether the test result was referred to in order to elicit an incriminating statement."[6] *Id.* Here, unlike in *Davis*, Vice did not offer to take the polygraph test. Instead, Fisher suggested that Vice take the test in response to Vice's question about what he could do to clear his name. In addition, unlike in *Davis*, the officers who conducted the post-polygraph interview referred to the polygraph results multiple times during the course of the interview. And more concerning, in response to Vice's repeated assertions that he did not remember assaulting the victim, the officers consistently reiterated that the polygraph results showed Vice did, in fact, remember the assault. Moreover, when Vice ultimately stated, "I'll admit that I must have did it because obviously the test says that I did it, but I don't

---

[6] The dissent pays little heed to this statement from *Davis*, characterizing it as "extremely vague" and suggesting that the authority cited by the *Davis* court does not actually support the proposition that an important consideration when analyzing the voluntariness of a post-polygraph statement is whether the officers referred to the test result in order to elicit an incriminating response. *See* Dissent, ¶88 n.3. We do not agree that the *Davis* court's statement can be so easily disregarded. Regardless of the authority cited by the *Davis* court, its statement was specific, and we are not free to disregard clear precedent. Instead, we, as did the circuit court, conclude the *Davis* court meant precisely what it said when it stated "[a]n important inquiry continues to be whether the test result was referred to in order to elicit an incriminating statement." *Davis*, 310 Wis. 2d 583, ¶42. Unlike the dissent, we therefore treat that inquiry as important when determining whether Vice's post-polygraph statements were voluntary.

physically remember," the officers did not respond to Vice's statement that because he had failed the polygraph test, he must have sexually assaulted the victim.[7]

¶64    Standing alone, the officers' repeated references to the polygraph results, while concerning, may not have caused us to conclude Vice's confession was involuntary. In addition to those repeated references, however, the officers never informed Vice—who had little experience with law enforcement—that the polygraph results would be inadmissible in any criminal proceedings against him.[8] *See Greer*, 265 Wis. 2d 463, ¶9.

¶65    Moreover, Vice had been given *Miranda* warnings before the polygraph examination. As such, he was expressly informed that any statement he made could be used against him in court. After the examination ended, Vice also signed the polygraph examination consent form a second time, which expressly stated, "I fully realize that … anything I say can be used against me in a court of law." Although there is no direct evidence that Vice interpreted these warnings to mean that the polygraph results could be used against him at trial, even the State concedes that the form "could have been clearer about which statements could and could not be used against Vice in court." The fact that Vice received *Miranda*

---

[7] Notably, we do not hold that police officers have an absolute duty to inform a defendant during a post-polygraph interview that polygraph tests are not infallible. We simply conclude that under the totality of the circumstances of this case, the officers' failure to correct Vice's stated misunderstanding that he "must have did it" because he had failed the polygraph was one factor that contributed to the creation of a coercive environment, which ultimately rendered Vice's confession involuntary.

[8] As noted above, we do not conclude Vice's confession was involuntary based on his personal characteristics. *See supra*, ¶60. Nevertheless, the fact that Vice had little experience with law enforcement is relevant to our analysis because it suggests Vice would not have been independently aware that the polygraph results would be inadmissible in any criminal proceedings against him.

warnings before the post-polygraph interview thus contributes to our concern regarding the voluntariness of his confession.

¶66    Under these circumstances, we agree with Vice that the officers used the polygraph results "to elicit an incriminating statement." *See Davis*, 310 Wis. 2d 583, ¶42.    The officers' repeated references to the polygraph results, including references by the polygraph test administrator, essentially communicated to Vice that the polygraph machine had detected a memory of the assault of which he stated he was not aware, and that he must be guilty because the machine "sa[id] that [he] did it."    While those tactics—in and of themselves—may not have been enough to render Vice's confession involuntary, the officers also failed to inform Vice that the polygraph results were inadmissible.[9]    Thus, Vice's overall impression was that the polygraph results proved he assaulted the victim, and those results could be used against him in court.    On these facts, we cannot conclude that Vice's confession was "the product of a free and unconstrained will, reflecting deliberateness of choice." *See id.*, ¶36.

¶67    The State argues the officers' references to the polygraph results during the post-polygraph interview must be viewed "in context."    Specifically, the State contends most of the references were made "in response to Vice saying he could not remember the assault," and Vice therefore "set the tone of the interview." We do not find the State's argument in this regard persuasive.    The fact that Vice asserted he did not remember the assaults did not give the officers free rein to exploit

---

[9]    The dissent questions whether an "omission" by law enforcement "can contribute to a finding of coercive conduct," stating it is "aware of no authority supporting this position or approach."    Dissent, ¶¶92, 94.    The dissent does not, however, cite any authority supporting the proposition that an omission by law enforcement *cannot* contribute to a finding of coercive conduct. Again, when assessing the voluntariness of a defendant's confession, we must consider the totality of the circumstances. *Davis*, 310 Wis. 2d 583, ¶37.

his lack of memory and his stated misunderstanding of the test results' import in order to coerce a confession.

¶68 The State also suggests that Vice's confession must have been voluntary because he admitted certain details of the sexual assault that the officers did not specifically reference in their questions. The dissent similarly emphasizes the fact that Vice ultimately provided detailed, inculpatory responses to the officers' questions about the alleged assault. *See* Dissent, ¶90. In so doing, both the State and the dissent appear to suggest that Vice's admissions to these details demonstrate that he did, in fact, sexually assault the victim. However, whether Vice actually committed the sexual assault of which he was accused is not at issue in this appeal. A confession that was obtained in violation of a defendant's constitutional rights must be suppressed. Although it might be tempting to deny suppression in a case where the contents of the defendant's confession suggest he or she committed the charged crime, the ends do not justify the means.

¶69 Further we disagree that Vice's provision of detailed answers in response to specific questions posed by the officers shows his confession was, in fact, voluntary. Vice was told by the officers at the beginning of his interview that any statements he made could be used against him in a court of law, yet he was unaware that the polygraph results were inadmissible. The officers then repeatedly confronted Vice with the failed polygraph results, telling him that despite his protestations to the contrary, the test showed he must remember committing the assault. Further, the officers did not correct Vice when he expressed the belief that because he had failed the polygraph test, he must have sexually assaulted the victim, instead telling him that things would go better for him if he confessed.

¶70    We deem it unsurprising that, under these circumstances, Vice would attempt to tell the officers what they wanted to hear by providing details of an alleged assault in response to the officers' leading and specific questions. Moreover, it does not surprise us that a defendant in Vice's position might falsely admit to certain acts—such as touching the victim's vagina—as a result of psychological pressures employed by the officers, but might also be unwilling to admit to other acts that could be viewed as being even more serious—such as engaging in penis-to-vagina intercourse with the victim.

¶71    The dissent also makes much of the fact that, in its opinion, the officers' conduct in this case was not as "egregious or outrageous" as conduct that has been found to be coercive in some other cases. *See* Dissent, ¶¶84-85. The dissent instead concludes that the officers in this case merely applied "subtle pressures" in order to elicit Vice's confession. *Id.*, ¶85. While the dissent concedes such "subtle pressures" can be considered coercive, it asserts that is only the case when they exceed the defendant's ability to resist, which can only occur in circumstances where the defendant had a compromised mental or physical condition. *Id.*

¶72    We disagree with the dissent that this case merely involves "subtle" psychological pressures. Instead, we conclude the totality of the circumstances here evidences that the officers improperly used coercive methods and strategies to overcome Vice's ability to resist including: (1) making numerous, repeated references to the polygraph results throughout the entire course of the post-polygraph interview; (2) repeatedly asserting that those results showed Vice—who claimed not to remember the assault—did remember it; (3) failing to correct Vice's statement that he must have assaulted the victim because the test said he did; and (4) failing to inform Vice that the test results would be inadmissible in any

criminal proceedings against him. While it is true that the officers' conduct in this case was not as egregious as the physical deprivations and threats at issue in the cases cited by the dissent, *see* Dissent, ¶84, we do not view the tactics employed here as merely "subtle" psychological pressures. Instead, we conclude these strategies would exceed most any defendant's ability to resist, regardless of whether he or she was physically or mentally compromised.

¶73 Ultimately, we conclude the officers' conduct here was unduly coercive, when viewed in its totality, in large part based on the nature of polygraph evidence, the reliability of which has long been questioned by Wisconsin courts. Prior to 1974, all polygraph evidence was inadmissible in Wisconsin. ***Estate of Neumann v. Neumann***, 2001 WI App 61, ¶56, 242 Wis. 2d 205, 626 N.W.2d 821. However, in ***State v. Stanislawski***, 62 Wis. 2d 730, 216 N.W.2d 8 (1974), our supreme court reconsidered the rule requiring blanket exclusion of polygraph evidence. ***Estate of Neumann***, 242 Wis. 2d 205, ¶56. Under ***Stanislawski***, polygraph evidence became admissible as long as four conditions were satisfied. *Stanislawski*, 62 Wis. 2d at 742-43.

¶74 The ***Stanislawski*** court "neither expressly ruled on the reliability of polygraph testing nor expressly discussed the role of the four conditions in justifying admission of the polygraph evidence." ***State v. Dean***, 103 Wis. 2d 228, 245, 307 N.W.2d 628 (1981). However, our supreme court later stated it was "apparent that the [***Stanislawski***] court viewed each of the ***Stanislawski*** conditions as having a function, namely obtaining the parties' waiver of objection to the validity of the basic theory of polygraphs, enhancing the reliability of the test or assuring the integrity of the trial." ***Dean***, 103 Wis. 2d at 246.

31

¶75    In 1981, our supreme court determined in *Dean* that the *Stanislawski* conditions were not "operating satisfactorily to enhance the reliability of the polygraph evidence and to protect the integrity of the trial process as they were intended to do." *Dean*, 103 Wis. 2d at 279.  The court therefore held that, going forward, polygraph evidence would once again be inadmissible in criminal proceedings.  *Id.*  "The primary basis for this holding was the court's lack of confidence in the reliability of polygraph test results."  *Estate of Neumann*, 242 Wis. 2d 205, ¶60.

¶76    To be sure, the *Dean* court did not expressly decide whether polygraph evidence was inherently unreliable under the standards for the admission of scientific evidence.  *Dean*, 103 Wis. 2d at 233-35.  Nevertheless, the court stressed that the legal and scientific communities remained "significantly divided on the reliability and the usefulness of the polygraph in a criminal case."  *Id.* at 234-35.

¶77    Discussing the scientific theory behind polygraph tests, the *Dean* court observed that a polygraph machine measures "certain involuntary bodily responses" such as blood pressure, pulse, and respiration.  *Id.* at 235.  The court noted there appeared to be empirical evidence supporting the existence of a relationship "between lying and emotions and between emotions and measurable physiological changes."  *Id.*  However, the court observed it was "universally conceded that the [polygraph] machine itself is not independently capable of separating truth from deception."  *Id.*  Thus, the "interaction of the examinee and the examiner and the conditions in which the test is given all play a critical role in the polygraph test."  *Id.*  In addition, the test's reliability "depends on the examinee's biological and psychological makeup," as well as "[t]he examiner's training, competence, experience, integrity and conduct during the test."  *Id.* at 236.

Moreover, "[a] crucial part of the testing and of the interpretation of the physiological data is the examiner's evaluation of the examinee's visible behavior, such as squirming, coughing, sniffing, and hesitancy." *Id.* at 237.

¶78 The *Dean* court explained that, in light of the above considerations,

[t]he determination of truth or deception cannot be made directly from the examinee's verbal responses or from the recordings of the machine but rather depends on the examiner's interpretation and analysis of the physiological changes measured and recorded on the charts. The analysis of the chart requires establishing timing between stimulations and responses, accounting for idiosyncrasies of the examinee as well as usual or unusual physiological responses due to anger, anxiety or other emotions. The examiner's analysis of the charts is not based merely on the recorded physiological measurements but on the examiner's subjective impressions of the outward behavior of the examinee. *Thus while the polygraph is enveloped in an aura of scientific precision and objective measurement of body responses, in large measure the result of the polygraph is dependent on the opinion of the examiner, and that opinion is drawn from a process which is almost completely in the control of the examiner.*

*Id.* (footnote omitted; emphasis added).

¶79 Ultimately, while the *Dean* court did not hold that polygraph evidence was inadmissible because it was inherently unreliable, the court nevertheless stated it was "not persuaded that the reliability of the polygraph is such as to permit unconditional admission of the evidence." *Id.* at 278-79. Accordingly, and because the court determined the *Stanislawski* conditions had not functioned effectively to enhance the reliability of polygraph evidence, the court held that such evidence would henceforth be inadmissible in criminal proceedings. *Id.* at 279-80.

¶80 This backdrop is critical to our analysis in the instant case. As explained above, it is due to serious concerns about the reliability of polygraph

evidence that our supreme court deemed that evidence inadmissible in criminal proceedings. Here, the officers not only administered a polygraph examination to Vice, but they also referred to the test results multiple times during the post-polygraph interview; repeatedly asserted that the test showed Vice remembered the assault, despite his claims not to remember; did not correct Vice's stated belief that the test—whose reliability our supreme court has seriously questioned—was infallible; and failed to inform Vice that the test results were inadmissible. The officers therefore used the results of a test whose reliability is subject to serious doubt in order to elicit an incriminating response from Vice, without informing him of the inadmissibility of the test's results. Under these circumstances, we conclude the officers' conduct was unduly coercive. Again, under *Davis*, when assessing the voluntariness of Vice's confession, it is "important" that the officers repeatedly referred to the test results in order to elicit an incriminating response. *See Davis*, 310 Wis. 2d 583, ¶42.

¶81 For all of the reasons set forth above, we affirm the circuit court's order suppressing Vice's confession. Critically, we do not hold that a confession made during a post-polygraph interview must be suppressed any time law enforcement refers to the polygraph results during the interview. Instead, we conclude Vice's confession was involuntary under the specific circumstances of this case, which included: (1) numerous, repeated references to the polygraph results throughout the course of the post-polygraph interview; (2) repeated assertions that those results showed Vice—who claimed not to remember the assault—did remember it; (3) the officers' failure to respond to Vice's statement that he must have assaulted the victim because the test said he did; and (4) the officers' failure to inform Vice that the test results would be inadmissible in any criminal proceedings against him. While any of these circumstances, standing alone, may have been

insufficient to render Vice's confession involuntary, together they demonstrate a level of coercion sufficient to overcome Vice's ability to resist. In particular, we caution law enforcement officers that if they plan to rely on polygraph results in order to elicit a defendant's confession, they need to inform the defendant that those results are inadmissible in court.

*By the Court.*—Order affirmed.

No.    2018AP2220-CR(CD)


¶82    HRUZ, J. (*concurring in part; dissenting in part*).  I agree with the majority that the polygraph examination and post-polygraph interview were discrete events, and I join in that portion of the opinion.[1]  *See* Majority, ¶¶44-53.  I disagree, however, with the conclusion that Vice's various inculpatory statements during the post-polygraph interview were not made voluntarily.  *See* Majority, ¶¶54-81.  I therefore respectfully dissent from that portion of the majority opinion, and I would reverse the circuit court's decision granting the motion to suppress.

¶83    I begin with the critical consideration in my mind.  As the majority correctly notes, *see* Majority, ¶55, "[c]oercive or improper police conduct is a necessary prerequisite for a finding of involuntariness."  ***State v. Hoppe***, 2003 WI 43, ¶37, 261 Wis. 2d 294, 661 N.W.2d 407.  Indeed, without any improper police conduct or tactics, there is no need to engage in the test of balancing the personal characteristics of the defendant against the pressures imposed by police.  ***State v. Berggren***, 2009 WI App 82, ¶30, 320 Wis. 2d 209, 769 N.W.2d 110 (citing ***State v. Clappes***, 136 Wis. 2d 222, 239-40, 401 N.W.2d 759 (1987)).  Thus, "[i]f neither coercion nor other improper conduct was used to secure the statement, it is deemed voluntary."  ***State v. Davis***, 2008 WI 71, ¶36, 310 Wis. 2d 583, 751 N.W.2d 332.  Here, I conclude no coercion or other improper conduct occurred.

¶84    Under applicable law, coercive and other improper police conduct includes what one would expect.  The United States Supreme Court, in discussing

---

[1] I appreciate the majority's thorough and accurate recitation of the relevant facts of this case in the Background section of its opinion.

such "police overreaching," has cited the following examples, based on prior cases: (1) subjecting a defendant to a four-hour interrogation while he was incapacitated and sedated in an intensive-care unit; (2) interrogating a defendant, who was on medication, for over eighteen hours without food or sleep; (3) holding a gun to the head of a wounded confessant in order to extract confession; (4) repeated interrogation of a defendant in a closed environment, while limiting his food, sleep, or medicine; and (5) officers informing a defendant that their police chief was preparing to admit a "lynch mob" into the jail. *Colorado v. Connelly*, 479 U.S. 157, 163 & n.1 (1986) (citations omitted). The need for such a level of misconduct is precisely because the constitutional protection is against "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, [that] are so offensive to a civilized system of justice that they must be condemned" as a violation of the right to due process of law. *Id.* at 163 (citation omitted).

¶85 In Wisconsin, we generally follow federal precedent in this area. *See State v. Edler*, 2013 WI 73, ¶29, 350 Wis. 2d 1, 833 N.W.2d 564. Our supreme court has interpreted federal law as establishing that "subtle pressures"—as opposed to egregious or outrageous police conduct—can be considered coercive, but only if those pressures have been such that they exceeded the defendant's ability to resist. *Hoppe*, 261 Wis. 2d 294, ¶46. This principle seems to apply only in contexts where the defendant had compromised mental or physical conditions, *see State v. Agnello*, 2004 WI App 2, ¶18, 269 Wis. 2d 260, 674 N.W.2d 594 (2003); *see also State v. Jerrell C.J.*, 2005 WI 105, ¶36, 283 Wis. 2d 145, 699 N.W.2d 110 (applying the principle in the context of a juvenile's written confession), and it is undisputed that Vice was not so compromised.

2

¶86 I conclude the conduct of the two officers imposed only minimal psychological pressures upon Vice and was within the boundaries of what due process tolerates for police questioning. Certainly, overt coercion is absent. As the video recording of the entire interview shows, and as the circuit court found, the interaction between Vice and the two law enforcement officials was not confrontational. In fact, the officers were—throughout the entire interview—calm and gentle with Vice. The officers never raised their voices, never became aggressive in other ways, never threatened Vice or told him he was going to jail, and they often paused their questioning and otherwise allowed Vice time to consider his thoughts and his statements.

¶87 As for "other improper police conduct," I see nothing of the sort. Indeed, the majority's opinion correctly notes that many of the concerns upon which it relies are not, standing alone, problematic as either conduct in general or as interview tactics specifically. Majority, ¶¶62, 64, 66, 81. Still, it *is* the totality of circumstances that matters. *See Hoppe*, 261 Wis. 2d 294, ¶38; Majority, ¶¶55, 72. Suffice it to say, I find that totality not to warrant suppression of Vice's confession; the majority concludes otherwise, for reasons ably explained in its opinion. The majority ultimately divines "unduly coercive" police conduct through how officers Fisher and Lambeseder "used the polygraph results 'to elicit an incriminating statement.'" Majority, ¶¶61, 66.[2] In so concluding, the majority addresses five particular considerations, *see* Majority, ¶¶80-81, none of which I find compelling.

---

[2] The majority concludes that the facts in this case establish that "neither Vice's personal characteristics nor the circumstances surrounding the interview convince us that Vice's confession was involuntary." Majority, ¶60. I agree. In particular, Vice's overall personal characteristics do not militate toward a finding of involuntariness.

3

¶88 First, the majority, like the circuit court, emphasizes that Fisher and Lambeseder referred to the polygraph results at least eleven times during the forty-five-minute post-polygraph interview. Majority, ¶61. True enough, but the circumstances of these references matter. They must matter because, ultimately, we need to analyze whether the references—whatever their total number—were so coercive as to overcome Vice's will.[3] *See Davis*, 310 Wis. 2d 583, ¶¶20-21, 35 (noting that statements made in interviews following an "honesty" test are subject to ordinary principles of voluntariness). The majority engages in this type of voluntariness analysis and concludes the officers "exploit[ed Vice's] lack of memory and his stated misunderstanding of the test results' import in order to coerce a confession," Majority, ¶67, but it largely seems to reach this conclusion through its last four considerations (i.e., not the number of references to the polygraph results).

¶89 In any event, I do not find the overall circumstances of the numerous references to the polygraph indicative of Vice's will being overcome. The first four

---

[3] I do not place the same import as the majority does in the singular, passing reference in *State v. Davis*, 2008 WI 71, 310 Wis. 2d 583, 751 N.W.2d 332, that "[a]n important inquiry continues to be whether the test result was referred to in order to elicit an incriminating statement." Majority, ¶63 (citing *Davis*, 310 Wis. 2d 583, ¶42). To be sure, the *Davis* court's voluntariness analysis noted that the defendant had not made an incriminating statement to the detective who administered the voice stress test and that the subsequent interviewing officer did not reference the test. *Davis*, 310 Wis. 2d 583, ¶42. But there is little in the court's decision to suggest what result would obtain under different facts, such as those in this case. *Davis*'s "important inquiry" language is extremely vague, and the supporting authority it cites—*State v. Johnson*, 193 Wis. 2d 382, 389, 535 N.W.2d 441 (Ct. App. 1995)—is a discussion concerning the discreteness issue, not voluntariness. Based upon *Davis*, I accept that the number, nature and circumstances of the references to the test are important considerations in the voluntariness analysis, but the ultimate question remains whether "coercive measures were used to elicit" an *involuntary* statement, *Davis*, 310 Wis. 2d 583, ¶42, which means, under the law, a statement made after the declarant's willpower was overcome.

references were in very close proximity to each other and during Lambeseder's opening comments to Vice, with the fifth one occurring not too much later and only after Vice asked if it was possible that he "blacked out." The sixth, seventh and eighth references came intermittently over the course of the next few minutes. A little after the eighth reference, Vice offered his first inculpatory statement. Two more inculpatory statements were made before the ninth reference, according to Vice's count in his appellate brief.

¶90 Notably, at this point Vice began making detailed statements regarding the night of the incident, including during the sexual assault. These statements occurred over a period of time and without any reference to the polygraph.[4] Majority, ¶¶20-23. Only after Vice provided these details did the last two references occur, which included the most troubling ones according to the circuit court—namely, (a) Fisher's comment regarding Lambeseder's knowledge about polygraphs and the techniques subjects use to hide their memory, and (b) Lambeseder himself extending his role in the interview, after having administered the polygraph examination, in stressing the impact of the test result. At that point, however, Vice had already made numerous inculpatory statements, including many detailed ones. This chronology and context, combined with the undisputedly nonconfrontational nature of the interview and the lack of any other alleged misconduct, informs my determination regarding voluntariness in the context of the repeated references to the polygraph test result.

¶91 Second, the majority notes that, in response to Vice's repeated assertions that he did not remember assaulting the victim, the officers consistently reiterated that the polygraph result showed Vice did, in fact, remember the assault.

---

[4] Vice made additional, detailed inculpatory statements later in the interview.

5

Majority, ¶63. I see little significance in the officers responding in this way. There is no genuine dispute that Lambeseder determined Vice had failed the examination or that the officers understood the test result to indicate that Vice remembered the assault. The actual veracity of those beliefs by the officers is not the issue here. Furthermore, the significance of the officers' references in this respect is diminished by the fact that, throughout the interview, the officers repeatedly asked Vice to just "tell the truth."

¶92 Third, the majority notes that "when Vice ultimately stated, 'I'll admit that I must have did it because obviously the test says that I did it, but I don't physically remember,' the officers did not respond to Vice's statement that because he had failed the polygraph test, he must have sexually assaulted the victim." Majority, ¶63. As an initial matter, I struggle with the notion that such an omission by law enforcement—here, not saying something regarding a defendant's allegedly mistaken belief—can contribute to a finding of coercive conduct. I am aware of no authority supporting this position or approach.

¶93 Furthermore, on what basis can we conclude that Vice actually had a "lack of memory" that day or that "he was not aware" of the memory purportedly detected by the polygraph? Majority, ¶¶66-67. To be sure, Vice denied any misconduct during the polygraph examination, and his inculpatory statements came only after the officers referenced his failed polygraph test and their representations that Vice's reactions during the test showed he "did remember" the incident. But we do not know whether or when Vice was, in fact, telling the truth. Only Vice himself knew, during the post-polygraph interview, whether he actually remembered the assault. Again, Lambeseder plainly concluded that Vice failed the polygraph, and there is no evidence or factual finding that Lambeseder reached an

6

incorrect conclusion, whether intentionally or not, despite the circuit court's rumination on the topic.

¶94 Fourth, the majority relies on the officers' failure to inform Vice that the polygraph result would be inadmissible in any criminal proceedings against him. Majority, ¶¶64, 66. Again, this constitutes an omission by the officers, not affirmative coercive conduct. As just stated, I struggle with the notion that law enforcement's *not* advising a defendant of a rule of trial admissibility contributes to a conclusion of coercion. In any event, there is no evidence in the record that Vice actually believed, during the post-polygraph interview, the polygraph "results could be used against him in court," Majority, ¶66, or that "he was unaware that the polygraph test result was inadmissible," Majority, ¶70. There was an evidentiary hearing in this case. Vice could have been asked or otherwise testified as to whether he did, in fact, have this view and consideration in mind during the post-polygraph interview. That never happened, and there is no finding of fact in this regard. Given that the majority recognizes the conclusion of police coercion here is a close one, *see* Majority, ¶56, I question the filling of factual gaps in the record with suppositions.[5]

¶95 Finally, the majority states that our supreme court's historical concerns over the reliability of polygraph evidence (and its corollary conclusion that such evidence is inadmissible in criminal proceedings) bear on its conclusion regarding voluntariness. Majority, ¶80. I have no qualms with the majority's recounting of the history and reasons leading to those conclusions of our supreme court, Majority, ¶¶73-79, nor with the notion that evidence of polygraph results

---

[5] By contrast, Vice was specifically asked whether he believed he was free to leave the post-polygraph interview, despite neither officer telling him that he was able to do so. Vice testified that he did not believe so.

7

should be inadmissible in criminal proceedings. That said, I simply do not see the relevance of those matters to determining whether, here, Vice's ability to resist the officers' questioning was overcome—i.e., that the officers' conduct was unduly coercive. Notably, law enforcement's use of the polygraph as an investigative tool has not been prohibited.

¶96 In all, I conclude that at no point during the noncustodial and nonconfrontational interview, which followed a voluntarily taken polygraph test, was Vice's "ability to resist" "exceed[ed]" by "the pressures brought to bear on" him by Fisher and Lambeseder. *See Hoppe*, 261 Wis. 2d 294, ¶¶36, 46. While the officers used "psychological pressures" in the course of their references to the polygraph results, I fail to see how those pressures were "excessive," such that we can conclude that law enforcement engaged in "coercive or improper police tactics" under the law. Even the circuit court's conclusion to the contrary found "the overt references to the failed test and the examiner's participation [in the post-polygraph interview]" only to be of a "*somewhat* coercive pressuring nature." (Emphasis added.)

¶97 Because I conclude Vice's multiple inculpatory statements during the post-polygraph interview were made voluntarily, such that they should not be suppressed, I respectfully dissent from that portion of the majority opinion.

8