# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP2220-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>        Plaintiff-Appellant-Petitioner,<br>   v.<br>Adam W. Vice,<br>        Defendant-Respondent. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 392 Wis. 2d 754,946 N.W.2d 206
PDC No:2020 WI App 34 - Published

| | |
|---|---|
| OPINION FILED: | June 16, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 9, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Washburn |
|   JUDGE: | John P. Anderson |

JUSTICES:

KAROFSKY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, REBECCA GRASSL BRADLEY, and DALLET, JJ., joined, and in which HAGEDORN, J., joined except for ¶25 and footnote 14. HAGEDORN, J., filed a concurring opinion.

NOT PARTICIPATING:

ANN WALSH BRADLEY, J., withdrew from participation.

ATTORNEYS:

For the plaintiff-appellant-petitioner, there were briefs filed by *Kara L. Janson*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Kara L. Janson*.

For the defendant-respondent, there was a brief filed by *Frederick A. Bechtold;* Taylors Falls, Minnesota. There was an oral argument by *Frederick A. Bechtold*.

An amicus curiae brief was filed on behalf of The Innocence Project, Inc., The Center on Wrongful Convictions of Youth, and the Wisconsin Innocence Project by *Carrie Sperling, Keith Findley,* and *University of Wisconsin Law School*, Madison; with whom on the brief was *Lauren Gottesman*; New York, New York.

**2021 WI 63**

No.  2018AP2220-CR
 (L.C. No.  2014CF162)

STATE OF WISCONSIN          :          IN SUPREME COURT

**State of Wisconsin,**

  **Plaintiff-Appellant-Petitioner,**

 **v.**

**Adam W. Vice,**

  **Defendant-Respondent.**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**JUN 16, 2021**

Sheila T. Reiff
Clerk of Supreme Court

KAROFSKY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, REBECCA GRASSL BRADLEY, and DALLET, JJ., joined, and in which HAGEDORN, J., joined except for ¶25 and footnote 14. HAGEDORN, J., filed a concurring opinion.

ANN WALSH BRADLEY, J., withdrew from participation.

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1  JILL J. KAROFSKY, J.  This case is about a post-polygraph interview.  We are tasked with deciding whether the circuit court[1] erred when it granted Adam Vice's motion to

---

[1] The Honorable John P. Anderson of the Washburn County Circuit Court presiding.

suppress, concluding that the statements he made during a post-polygraph interview were involuntary. The court of appeals[2] affirmed the decision of the circuit court, and now the State seeks review.

¶2 We conclude that the statements Vice made during his post-polygraph interview are admissible because: (1) the interview was discrete from the polygraph examination; and (2) the statements were not the product of police coercion, and therefore were voluntary. Accordingly, we reverse the decision of the court of appeals.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶3 On December 4, 2014, Investigator William Fisher of the Washburn County Sheriff's Department——who was investigating child sexual assault allegations in which a four-year-old girl reported to her caregiver that Vice had sexually assaulted her——met with Vice at Vice's workplace. During their meeting, Vice denied any wrongdoing and discussed with Fisher whether "there was anything [Vice] could do to clear [his] name." Fisher suggested that Vice take a polygraph examination; Vice agreed to do so. Four days later, Vice called Fisher to arrange the polygraph examination. It was scheduled for 10:00 a.m. on December 11 at the Eau Claire Police Department. Because Vice did not have his own transportation, he accepted Fisher's offer of a ride to the examination.

---

[2] State v. Vice, 2020 WI App 34, 392 Wis. 2d 754, 946 N.W.2d 206.

## A. The Polygraph Examination

¶4 On December 11, Fisher arrived at Vice's residence in an unmarked police car to find Vice waiting for him outside. At Fisher's invitation, Vice sat in the front seat of the car. Fisher reminded Vice that he did not have to take the polygraph examination, and that his participation was voluntary. Vice was not handcuffed. Vice and Fisher did not discuss the sexual assault allegations or the upcoming polygraph examination during the drive, which lasted slightly less than two hours.

¶5 Upon arriving at the police station, Eau Claire Police Detective Ryan Lambeseder escorted Vice to the polygraph examination room, while Fisher went to an observation room. Prior to the start of the polygraph examination, Vice signed a "Waiver of Rights" form that recited his Miranda rights.[3] He also signed a "Polygraph Examination Consent" form, which Lambeseder read aloud to him, indicating that he "voluntarily: without threats, duress, coercion, force, promises of reward or immunity, agree[d] and stipulate[d] to submit to take a polygraph (truth verification) examination."[4]

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

[4] The form stated:

I fully realize that: I am not required to take this examination, I may remain silent the entire time I am here, anything I say can be used against me in a court of law, I may first consult with an attorney or anyone I wish to before either signing this form or taking the examination, I may have an attorney present, if I cannot afford an attorney and desire one, an attorney will be appointed for me prior to any questioning, and I have

3

¶6 Lambeseder also reviewed with Vice the Eau Claire Police Department Polygraph Examination Data Sheet and wrote down Vice's answers. Vice described his physical condition at the time as "average" and stated that he:

- was experiencing no discomfort;

- had eaten in the last 24 hours;

- had slept fairly for eight or more hours the night before;

- had no problems with high blood pressure or seizures;

- had not consumed alcohol or drugs in the previous 24 hours;

- had a high school education;

- had been arrested once before; and

- had never seen a psychologist or psychiatrist.

¶7 The polygraph examination lasted one hour and 45 minutes. During that time, Lambeseder never raised his voice, threatened Vice, or made any promises to him, and Vice made no admissions of wrongdoing. After the polygraph examination concluded, Vice again signed the Polygraph Examination Consent Form.[5]

_____

the opportunity to exercise all these rights at any time I wish to during the entire time I am here. Further, that I can pick and choose the questions I wish to answer and can stop the interview at any time I wish.

[5] The form stated:

This examination was concluded at 11:40 a[.]m[.] on [December 11, 2014]. I completely reaffirm, in its entirety, my above agreement. In addition, I knowingly

B. The Post-Polygraph Interview

¶8   Once Vice signed the second form, Lambeseder escorted him to a separate interview room.  Vice sat at a small table, facing the door with a wall behind him.  Fisher and Lambeseder joined him ten to 15 minutes later to commence the interview.

¶9   Over the course of the approximately 45-minute interview, Fisher and Lambeseder made at least 11 references to Vice's polygraph results.[6]  The first four references took place immediately, when Lambeseder told Vice, "You didn't pass the exam." Lambeseder continued:  "[T]he questions regarding [the victim], it's very clear, Adam, that you weren't telling the truth . . . . And I can tell on that exam, okay?"  The fifth reference occurred soon after, when Vice asked if it was possible that he "blacked out" and Lambeseder responded, "You do remember doing it, otherwise you wouldn't react the way you did on the exam, okay?"  The next three references occurred intermittently over the next few minutes, and referred to Vice's "reactions" without specifically referencing the polygraph examination.  For example, "It's not blocked out . . . because you've reacted".

and intelligently continue to waive my rights . . . and I willingly made all statements that I did make.  I also understand that any questions I may be asked after this point in time, and any answers that I may give to those questions, are not part of the polygraph examination.

[6] The circuit court found that between the two of them, Fisher and Lambeseder made a total of 11 references to Vice's polygraph examination and to polygraph examinations generally.  Vice, 392 Wis. 2d 754, ¶36.  We accept this factual finding by the circuit court.

¶10 About a minute later (eight minutes into the interview), Vice offered his first inculpatory statement in response to Fisher's assurances that the criminal justice system would address his case more leniently if the assault was "an isolated mistake" and Vice "underst[ood] that he messed up." Vice's initial statement admitting to the assault was responsive to Lambeseder telling Vice to "[b]e truthful." Vice said, "It's going to sound really shitty for me to say this right now, but I sexually assaulted [the victim]." Two minutes later (ten minutes into the interview) Vice stated, "I'll admit that I must have did it because obviously the test says that I did it, but I don't physically remember," in response to which Lambeseder made the ninth reference: "Try, okay . . . . If we believe that you didn't remember, we wouldn't be talking to you about this, you know?"

¶11 Vice then began making statements regarding his access to the victim. About six minutes later (16 to 17 minutes into the interview), Lambeseder made the tenth reference, stating, "it shows on the test that you remember, okay?" Lambeseder then informed Vice that the victim disclosed details about Vice's conduct by both describing and physically demonstrating how he assaulted her. Lambeseder urged Vice to tell the truth and to take responsibility so that Vice and the victim could both get help. The officers offered to ask Vice direct questions with "yes" or "no" answers so that the interview would be easier for Vice, and he accepted that offer. Vice then began providing details about the sexual assault itself, over a period of about eight

minutes, in response to the officers' specific questions and without any reference to the polygraph examination.

¶12 Around 30 minutes into the interview, after Vice provided numerous details about the assault, Fisher made the 11th and final reference to the polygraph examination. He mentioned Lambeseder's experience "working with the polygraph things" to show Lambeseder's familiarity with "the techniques people use" to avoid admitting responsibility for sexual assaults, but Fisher did not mention Vice's polygraph results. While Vice repeatedly claimed not to remember whether he had sexually assaulted the victim, at no point during the interview did Vice deny outright having done so.

¶13 For the last 12 minutes of the interview, neither officer referenced the polygraph results as Vice continued to answer direct questions about the assault. Vice responded with admissions and details such as what the victim was wearing, that he had been drinking and playing video games the night of the incident, and how he committed the assault.

¶14 At no time during the post-polygraph interview did either officer:

- raise his voice or use a hostile tone when speaking to Vice;

- make any threats or promise any inducements in order to elicit Vice's statements; or

- inform Vice that polygraph results are inadmissible in court.

At the conclusion of the interview, Vice was not arrested; instead Fisher drove him home and he once again sat in the front seat.

### C. Procedural History

¶15 The day after the interview, the State filed a criminal complaint charging Vice with one count of sexual contact with a person under the age of 13, contrary to Wis. Stat. § 948.02(1)(e) (2019-20).[7] Vice filed a motion to suppress as involuntary all of the statements he made during his post-polygraph interview, arguing that the tactics used in that interview were coercive "for one simple legal and factual reason[:] the detectives repeatedly told [him] he failed the polygraph examination before getting the statement they wanted." Vice never argued during the suppression proceedings that the polygraph examination and the post-polygraph interview were not discrete events.[8]

¶16 The circuit court suppressed Vice's statements, finding that "the State made a number of references to a failed polygraph at both times, and under certain circumstances, they created a coercive environment . . . that becomes the fatal flaw in the

---

[7] While Vice was convicted based on conduct that occurred in 2014, the statutory provisions under which he was convicted have not substantively changed. Therefore, we cite to the current version of the Wisconsin Statutes. Unless otherwise noted, subsequent references to the Wisconsin Statutes are to the 2019-20 version.

[8] In his August 2015 motion to suppress, Vice argued only that his statements were involuntary. At the September 2015 suppression hearing, Vice's counsel conceded discreteness, stating that "the police got it half right. You're supposed to take the polygraph [examination] and [interview] separate. They did that right."

8

totality of the circumstances of this confession." The State appealed.

¶17 For the first time on appeal, and contrary to his argument to the circuit court at the suppression hearing, Vice argued that his post-polygraph interview should be suppressed because his polygraph examination and post-polygraph interview were not discrete events. The court of appeals ruled that Vice was judicially estopped from arguing that the interview and the preceding polygraph examination were not discrete events. Additionally, it determined that the circuit court erroneously concluded that the references to Vice's failed polygraph examination alone rendered his statements involuntary. The court of appeals instructed the circuit court to make sufficient factual findings on the record to support a totality-of-the-circumstances analysis regarding the voluntariness of Vice's statements. State v. Vice, No. 2015AP2558-CR, unpublished slip op., ¶¶1, 21, 26-27 (Wis. Ct. App. Sept. 13, 2016).

¶18 On remand, the circuit court balanced factors weighing for and against the voluntariness of Vice's statements and determined that Vice was "overwhelmed by the somewhat coercive pressuring nature of the overt references to the failed test and [Lambeseder's] participation in that." The circuit court concluded that Vice's statements were involuntary because of the officers' multiple references to his polygraph results.

¶19 The State again appealed. The court of appeals exercised its discretion to consider the merits of Vice's discreteness argument despite its conclusion that judicial estoppel applied,

9

and determined that the polygraph examination and subsequent interview were discrete events. State v. Vice, 2020 WI App 34, ¶¶45-46, 48, 392 Wis. 2d 754, 946 N.W.2d 206. The court of appeals also affirmed the circuit court's decision to suppress Vice's post-polygraph statements as involuntary, concluding that although neither Vice's personal characteristics nor the circumstances surrounding the interview rendered Vice's statements involuntary, the officers': (1) multiple references to the polygraph results; (2) assertions that those results indicated that Vice remembered committing the offense; (3) failure to contradict Vice's statement that he must have committed the assault because the polygraph results indicated that he had; and (4) failure to inform Vice that the polygraph results would be inadmissible in court were coercive methods used to overcome Vice's ability to resist. Id., ¶¶60, 80.[9]

¶20 The State petitioned this court for review, which we granted.

## II. STANDARD OF REVIEW

¶21 We review the court of appeals' decision affirming the circuit court's decision to suppress Vice's statements. In reviewing a motion to suppress, we ordinarily apply a mixed standard of review, upholding any findings of fact unless clearly erroneous, but independently considering whether those facts show

---

[9] The dissent disagreed with the majority's conclusion that the totality of the circumstances established that Vice's statements were involuntary, concluding that the officers did not use coercive or improper police tactics. Vice, 392 Wis. 2d 754, ¶96 (Hruz, J., dissenting).

10

a constitutional violation. State v. Young, 2006 WI 98, ¶17, 294 Wis. 2d 1, 717 N.W.2d 729. Because this case does not challenge any factual findings, but presents only whether Vice's statements were voluntary, our review is de novo. Id.

### III. ANALYSIS

¶22 We begin our analysis by discussing the law as it relates to statements made during post-polygraph interviews and the use of polygraph results during those interviews. Next, we address whether Vice's post-polygraph interview was discrete from his polygraph examination. We then review the general standards for establishing whether statements are voluntary, focusing on the issue of coercion or improper police conduct——a prerequisite for involuntariness. We then apply that voluntariness analysis to the specific facts in this case and examine the four police tactics Vice contends, and the court of appeals concluded, rendered his statements involuntary. We finish by assessing the circumstances surrounding the post-polygraph interview to determine if the officers engaged in any other coercive practices that would render Vice's statements involuntary.

### A. Use of Polygraph Results in Post-Polygraph Interviews

¶23 Polygraph results themselves, as well as statements made by suspects during polygraph examinations, are generally inadmissible in court. Wis. Stat. § 905.065(2). Despite this general rule of inadmissibility, both suspects and law enforcement officers place reliance on polygraph examinations. Suspects voluntarily submit to polygraph examinations in an effort to lift the cloud of suspicion. State v. Greer, 2003 WI App 112, ¶9, 265

11

Wis. 2d 463, 666 N.W.2d 518. Law enforcement uses polygraph examination as an investigative tool in criminal cases. See, e.g., Wyrick v. Fields, 459 U.S. 42, 43-46 (1982); Maryland v. Shatzer, 559 U.S. 98, 101-102 (2010).[10]

¶24 Statements made during a post-polygraph interview are admissible into evidence when they satisfy the two-part test we established in State v. Davis, 2008 WI 71, ¶21, 310 Wis. 2d 583, 751 N.W.2d 332.[11] The first part of the test is determining whether the post-polygraph interview was a discrete event from the polygraph examination. Id., ¶21. That is, whether the post-polygraph interview is "so closely associated with the [polygraph examination] that the [examination] and statement[s] are one event

---

[10] Law enforcement——particularly in the context of child sexual exploitation investigations——identifies polygraph examinations as an important tool in helping to uncover crimes of sexual abuse. Jason Scheff, Disproving the "Just Pictures" Defense: Interrogative Use of the Polygraph to Investigate Contact Sexual Offenses Committed by Child Pornography Suspects, N.Y.U. Ann. Surv. Am. L. 603, 605 (2013). The polygraph examination is a particularly important tool with regard to sex offenders because of the secrecy and denial that often accompany those offenders' behavior. Id. at 631. It is often the case that disclosures of these types of offenses only occur after a failed polygraph examination. Id. at 626. And convicted sex offenders in Wisconsin may be required to submit to polygraph testing as part of their correctional programming or care and treatment. See Wis. Stat. § 301.132(2).

[11] In Davis, we addressed a situation in which a suspect consented to a voice stress analysis rather than a polygraph examination prior to making an inculpatory statement, but we determined that the same legal principles apply equally to both types of examinations. State v. Davis, 2008 WI 71, ¶20, 310 Wis. 2d 583, 751 N.W.2d 332.

rather than two events." Id., ¶2. The second part of the Davis test is whether the post-polygraph statements are voluntary under ordinary constitutional due process considerations. Id., ¶35.[12] We will address each of these two parts in turn, first determining whether Vice's post-polygraph interview was discrete from his polygraph examination, and then whether the statements Vice made during that interview were the result of impermissible police coercion, and therefore involuntary.

## B. Discreteness

¶25 We first determine whether Vice's post-polygraph interview was a discrete event from his polygraph examination—the discreteness prong of the two-part Davis test.[13] When a post-polygraph interview is so closely associated with the polygraph examination that the examination and interview are "one event rather than two events," the statements made during that interview

---

[12] We will refer to these issues as "discreteness" and "voluntariness" for the remainder of this opinion.

[13] The parties dispute whether the issue of discreteness is before this court. We note that Vice conceded the issue to the circuit court in both his brief in support of his motion to suppress and during the oral ruling on that motion. In his brief, Vice acknowledged that "[T]he detectives got the first part of the process right, they separated the polygraph test from the interrogation." Additionally, during the oral ruling on the suppression motion, Vice's attorney stated that "[T]he police got it half right. You're supposed to take the polygraph exam and interrogation separate. They did that right." Because Vice conceded the issue twice to the circuit court, we conclude that he waived the discreteness issue. However, waiver is a rule of judicial administration and appellate courts may reach the merits of an issue that has been waived. State v. Erickson, 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999). The court of appeals' decision addressed discreteness; we elect to do so here as well.

13

must be suppressed. Davis, 310 Wis. 2d 583, ¶2. Our determination of discreteness "is largely dependent upon whether the [polygraph examination] is over at the time the statement is given and the [suspect] knows the [polygraph examination] is over." Id., ¶23. We consider: (1) whether the suspect was told the test was over; (2) whether any time passed between the polygraph examination and the interview; (3) whether the officer who conducted the polygraph examination differed from the officer who conducted the interview; (4) whether the examination and interview were held in the same location; and (5) whether the examination was referred to during the interview. Id. "An important inquiry [is] whether the test result was referred to in order to elicit an incriminating statement." Id., ¶42. However, we look to the totality of the circumstances in determining discreteness. Id., ¶32.

¶26 In applying the Davis factors, we conclude that: (1) Lambeseder told Vice the examination was over and Vice signed a form acknowledging that it had ended; (2) a period of ten to 15 minutes elapsed between the end of the examination and the commencement of the interview; (3) while Lambeseder both administered Vice's polygraph examination and conducted the interview, Fisher participated only in the interview; (4) the polygraph examination and post-polygraph interview took place in different rooms; and (5) although the officers referred to the polygraph results during Vice's interview, this factor alone does not make the interview and the examination "one event" where, as here, there is both a temporal and spatial differentiation between the two events. Greer, 265 Wis. 2d 463, ¶16. Based upon the

14

totality of the circumstances pursuant to these points, we conclude that Vice's polygraph examination and post-polygraph interview were discrete events.

### C.    Voluntariness and Coercion

¶27  Having established that Vice's post-polygraph interview was a discrete event under the first part of the Davis test, we turn to the second part——voluntariness.  We begin by outlining the law regarding voluntariness and coercion.

¶28  The Fourteenth Amendment of the Constitution and Article I, Section 8 of the Wisconsin Constitution require a statement to be voluntary in order to be admitted into evidence.  State v. Hoppe, 2003 WI 43, ¶36, 261 Wis. 2d 294, 661 N.W.2d 407; see also Dickerson v. United States, 530 U.S. 428, 433 (2000).  The admission of an involuntary statement into evidence is a violation of a criminal defendant's constitutional right to due process. Hoppe, 261 Wis. 2d 294, ¶36.

¶29  It is the State's burden to prove by a preponderance of the evidence that a suspect's statements are voluntary.  Id., ¶40. "A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by . . . the State exceeded the defendant's ability to resist."  Davis, 310 Wis. 2d 583, ¶36 (quoted source omitted).

¶30  Over time, our due process inquiry has been refined into one that "examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession . . . [and]

15

takes into consideration the totality of all the surrounding circumstances." Dickerson, 530 U.S. at 434 (quoted sources omitted). That analysis involves balancing the suspect's personal characteristics, such as age, intelligence, physical and emotional condition, and prior experience with law enforcement, against any pressures imposed upon him by police. State v. Clappes, 136 Wis. 2d 222, 236, 401 N.W.2d 759 (1987).

¶31 Before we balance personal characteristics against police pressures, we must first examine the threshold matter of coercion. "The presence or absence of actual coercion or improper police practices is the focus of the inquiry because it is determinative" on the issue of voluntariness. Id.; see also Colorado v. Connelly, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). If our analysis of the facts does not reveal coercion or improper police pressures, there is no need for us to engage in the balancing test between the suspect's personal characteristics and those nonexistent pressures. State v. Berggren, 2009 WI App 82, ¶30, 320 Wis. 2d 209, 769 N.W.2d 110.

¶32 While coercive or improper police conduct "may arguably take subtle forms," Clappes, 136 Wis. 2d at 238, the protections of the Due Process Clause are intended to safeguard against conduct or circumstances that "destroyed [the suspect's] volition and compelled him to confess." Connelly, 479 U.S. at 162. As a result, establishing coercion is a high bar for a defendant to surmount. Megan Annitto, Confessions and the Right to a Fair

16

Trial: A Comparative Case Study, 35 Berkeley J. Int'l L. 181, 201 (2017).

¶33 To aid us in identifying coercive police conduct, we review cases in which courts have analyzed various police tactics to determine whether or not they were coercive. Such a review reveals that this court has determined that police tactics were not coercive where officers interrogated an injured and intoxicated suspect in a hospital emergency room or exaggerated evidence. Clappes, 136 Wis. 2d at 238 (suspect "appeared to be coherent, though . . . in great pain"); State v. Lemoine, 2013 WI 5, ¶32, 345 Wis. 2d 171, 827 N.W.2d 589 (police informed suspect that "extensive tests had been done and that it probably would not look good for [him] when the results came in"). We have also determined that even when police engage in outright deceit, they may be "within the bounds of acceptable police practice." State v. Albrecht, 184 Wis. 2d 287, 300, 516 N.W.2d 776 (Ct. App. 1994).

¶34 Our review also reveals cases in which courts have found police tactics to be coercive, such as when officers engage in physical violence to obtain a statement——that is per se coercive and a violation of due process. Stein v. New York, 346 U.S. 156, 182, (1953) (physical violence is per se coercion), overruled on other grounds by Jackson v. Denno, 378 U.S. 368, 381, (1964). In addition to physical violence, the United States Supreme Court has stated other factors indicative of coercion are an incapacitated and sedated suspect, sleep and food deprivation, and threats. Berghuis v. Thompkins, 560 U.S. 370, 387 (2010). The United States Supreme Court has also determined that holding a suspect for more

17

than 16 days, interrogating that suspect "extensively," feeding him an "extremely limited" diet, and not permitting him to communicate with the outside world were improper coercive tactics. Davis v. North Carolina, 384 U.S. 737, 745-48 (1966).

¶35 It is important to note that even when a defendant establishes coercive police tactics, the resulting statement is not automatically rendered involuntary. A defendant must also show that, as a result of those pressures, the statement was no longer "the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the [suspect] by . . . the State exceeded the [suspect's] ability to resist." Hoppe, 261 Wis. 2d 294, ¶36. In short, without coercion, there is no involuntariness.

¶36 In this case, we must determine whether officers' references to polygraph results in a post-polygraph interview were not only coercive, but sufficiently coercive as to render a suspect's statements involuntary. We begin by noting that the use of polygraph results in an interview is not "inherently coercive." Wyrick, 459 U.S. at 48-49. That is, simply because officers make such references does not in itself mean the references were coercive, absent a finding that they were used to elicit involuntary statements. Police are free to let a suspect know that he did not pass the polygraph examination or to let a suspect draw that inference. Greer, 265 Wis. 2d 463, ¶16. We held in Davis that making such references is not per se coercive. Davis,

310 Wis. 2d 583, ¶42.[14] To hold otherwise "would be an unjustifiable restriction on reasonable police questioning." Wyrick, 459 U.S. at 48-49.

¶37 Having established that statements made during a discrete post-polygraph interview are admissible if they are voluntary; that coercion is a necessary predicate to involuntariness; and that referring to polygraph results during a post-polygraph interview is not per se coercive, we must now apply that law to the tactics the officers used during Vice's interview.

C. The Absence of Coercive Practices in Vice's Interview

¶38 To apply the voluntariness analysis explained above to Vice's interview, we must begin with a review of the practices the court of appeals determined and Vice argues were coercive, since "[c]oercive or improper police conduct is a necessary prerequisite for a finding of involuntariness." Hoppe, 261 Wis. 2d 294, ¶37. Where there is no evidence of any coercive police practices, we

---

[14] The court of appeals in this case relied on but misunderstood our statement in Davis that "[a]n important inquiry continues to be whether the [polygraph examination] was referred to in order to elicit an incriminating statement." Vice, 392 Wis. 2d 754, ¶42 (emphasis added). To clarify, our statement in Davis regarding polygraph references as an important inquiry referred to the discreteness analysis in that case, not the voluntariness analysis. Id. The court of appeals' interpretation overlooks our citation to State v. Johnson, 193 Wis. 2d 382, 389, 535 N.W.2d 441 (Ct. App. 1995), which ties that statement specifically to the discreteness determination. The use of polygraph references in post-polygraph interviews is an important inquiry in determining discreteness, but it is only one of many relevant factors to consider in determining voluntariness. Therefore, we do not afford the polygraph references here any more weight than any other relevant aspect of an interview.

19

need not balance police pressures against the personal characteristics of the suspect.  Berggren, 320 Wis. 2d 209, ¶30. We focus our analysis here, as the court of appeals did, on the tactics the officers used during Vice's interview.

¶39  The court of appeals concluded that four tactics Fisher and Lambeseder employed during Vice's post-polygraph interview were sufficiently coercive as to render Vice's statements involuntary:  (1) their repeated references to Vice's polygraph results during the interview; (2) their assertions that Vice remembered the assault despite his claims not to remember; (3) their failure to contradict Vice's statement that he must have assaulted the victim because the polygraph results said that he did; and (4) their failure to inform Vice that the polygraph results were inadmissible in court.  Vice, 392 Wis. 2d 754, ¶72. We will address each in turn.

¶40  The first tactic that the court of appeals determined was coercive was the officers' use of references to Vice's polygraph examination.  Vice, 392 Wis. 2d 754, ¶66.  Fisher and Lambeseder made at least 11 references to Vice's polygraph examination over the course of his 45-minute interview.  Id., ¶61. While we have previously held that a single reference to polygraph results does not constitute coercion, Davis, 310 Wis. 2d 583, ¶41, this case requires us to determine whether multiple references constitute coercion.

¶41  Contrary to the court of appeals' conclusion, we draw a substantive parallel between the suspect's offer to take the polygraph examination in Davis, and Vice's offer to Fisher to

"clear [his] name" coupled with his subsequent agreement to take a polygraph examination when Fisher suggested it.  Vice agreed to take the polygraph examination while at his own place of employment, not at the police station.  Vice himself initiated the telephone call to Fisher to schedule the examination.  A polygraph "can hardly be considered a strategy of the police officers [when] it was administered to the defendant upon his request, and the statement was given after the test was over and the defendant knew the test was over."  Id., ¶25 (quoted source omitted).

¶42 While the number of references to the polygraph examination and results during Vice's interview was greater than the single reference we held uncoercive in Davis, the context and nature of those references matter, notwithstanding their total number.  In this case, four of the polygraph references occurred in close proximity to each other at the commencement of the interview, and three of those references took place near the end of the interview after Vice had already confessed.  Vice's initial incriminating statement, made eight minutes into the interview, came in direct response to the officers telling Vice that if he confessed to the single offense, he would be less likely to be considered a "dangerous" habitual offender who could not be "in the community."  Vice provided statements regarding specific details of the sexual assault throughout the interview without referencing the polygraph results.

¶43 During the course of the 45-minute interview, the polygraph references constituted only one component of the dialogue between the officers and Vice.  The officers used other

21

tactics far more frequently and effectively during the interview, and it was those tactics that led most directly to Vice making statements against self-interest. The officers repeatedly urged Vice to be truthful. They offered to ask Vice specific questions to which he could answer "yes" or "no" rather than having him describe the details of the sexual assault himself. They made empathetic statements, and they offered to get Vice the help he needed. Under these circumstances, we agree with the State that the officers' references to the polygraph results did not constitute coercive or improper conduct. In addition, it would be "unreasonable" for a suspect in a post-polygraph interview to "assume that [he] would not be informed of the polygraph readings and asked to explain any unfavorable result." Wyrick, 459 U.S. at 47. Said differently, ignoring Vice's polygraph examination in his post-polygraph interview would be like ignoring an elephant in the room.

¶44 The second tactic the court of appeals considered coercive was the officers' use of statements that the polygraph examination showed that Vice remembered the assault. Vice, 392 Wis. 2d 754, ¶63. These statements did not constitute coercion. There is no dispute that Vice failed the polygraph examination; the officers viewed that result as an indication that Vice did, in fact, remember committing the assault. The officers' insistence that Vice's reactions during the polygraph examination indicated that he did remember were simply another way of characterizing those results. And even if we assume without deciding that those statements were outright falsehoods, they would not rise to the

22

level of coercion absent being coupled with some other, more coercive practice used on a particularly vulnerable suspect. See, e.g., Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (statement was involuntary where a false promise of leniency was combined with threats to remove suspect's children and welfare benefits along with other factors).

¶45 Further, it is settled law that police may engage in active deception, including lying to a suspect, without rendering that suspect's statements involuntary. Lemoine, 345 Wis. 2d 171, ¶20 ("[U]sing deception in interrogation is common and generally acceptable."). Misrepresentations by police are a relevant factor in determining the voluntariness of a suspect's statements, but do not necessarily make those statements involuntary when considered in light of the totality of the circumstances of the interview. State v. Ward, 2009 WI 60, ¶27, 318 Wis. 2d 301, 767 N.W.2d 236. The officers' statements that Vice's polygraph examination failure indicated that he remembered committing the assault were consonant with this type of interview technique. We disagree with the court of appeals and conclude that that this tactic was not coercive.

¶46 Third, the court of appeals reasoned that the officers' failure to correct Vice's "stated misunderstanding" that "I'll admit that I must have did it because obviously the test says that I did it, but I don't physically remember" was a factor contributing to the creation of a "coercive environment." Vice, 392 Wis. 2d 754, ¶63 & n.7. But, as the court of appeals noted, interrogators have no absolute duty to inform a suspect during a post-polygraph interview that polygraph examinations are fallible.

23

Id. Additionally, the officers were not required to believe Vice's claims that he did not remember, and it was not coercive for them to question those claims during the interview. We cannot agree that the officers used coercive tactics to "exploit [Vice's] lack of memory," id., ¶67, when there is simply no evidence in the record to indicate whether or not Vice was being truthful. This lack of response is not the kind of affirmative coercive conduct that would render Vice's statements involuntary.

¶47 Finally, the court of appeals determined that the officers' failure to inform Vice that his polygraph results would be inadmissible in any criminal proceedings against him was a coercive act. Id., ¶64. We do not deem an omission such as this to be coercive when compared with the outright deception that the Due Process Clause permits. See Frazier v. Cupp, 394 U.S. 731, 739 (1969) ("The fact that the police misrepresented the statements that [the suspect's accomplice] had made is, while relevant, insufficient in our view to make [an] otherwise voluntary confession inadmissible."). We therefore conclude that none of the four tactics singled out as problematic by the court of appeals were coercive.

¶48 We further determine that, even if none of the individual tactics discussed above were coercive in and of themselves, they likewise did not add up to coercion resulting in involuntariness when considered together. Police may, and often do, engage in multiple tactics and strategies in the same interview without rendering coercive what would be permissible in isolation. We conclude that the tactics employed by the officers during Vice's

24

post-polygraph interview, both in isolation and in the aggregate, were not coercive. Because a suspect's statements cannot be involuntary absent police coercion, it is not necessary to balance these tactics against Vice's personal characteristics; there is simply nothing against which to balance them. Berggren, 320 Wis. 2d 209, ¶30.

¶49 Having determined that none of the polygraph-related tactics used by the officers in Vice's interview, individually or considered in the aggregate, were coercive, we turn to the rest of the circumstances surrounding the interview to ensure that there was no other coercive or improper activity at play. In our examination of the police pressures or tactics employed during an interview, we consider a number of factors, including:

- the length of the interview;
- the general circumstances under which the statements took place;
- whether any excessive physical or psychological pressure was used;
- whether any inducements, threats, methods, or strategies were used to compel a response; and
- whether the suspect was informed of the right to counsel and against self-incrimination.

Hoppe, 261 Wis. 2d 294, ¶39.

¶50 As the court of appeals correctly concluded, none of "the circumstances surrounding the interview convince us that Vice's confession was involuntary." Vice, 392 Wis. 2d 754, ¶60. The length of Vice's interview was short——only 45 minutes. See,

25

e.g., Lemoine, 345 Wis. 2d 171, ¶3 (75-to-80-minute interview not coercive); Davis, 310 Wis. 2d 583, ¶¶11, 39 (duration of 45-minute interview "was not lengthy"). The circumstances of the interview were similarly benign. Vice went to the police station voluntarily. At no point was Vice restrained or physically abused, and the room in which the interview took place was not uncomfortable. The officers spoke to Vice in a calm tone of voice throughout, made no threats, and offered no inducements to Vice. Vice was informed of his right to counsel and his right against self-incrimination[15] before both his polygraph examination and his post-polygraph interview.[16]

¶51 We also give weight to the fact that the polygraph examination and post-polygraph interview took place on Vice's own initiative. The United States Supreme Court has singled out this factor in its holding that "the totality of the circumstances, including the fact that the suspect initiated the questioning, is

---

[15] The circuit court noted erroneously that the Miranda warnings were "discussed before the polygraph but not before the post-polygraph interview." In fact, Vice signed a form at the conclusion of the polygraph examination stating that he "knowingly and intelligently continued[d] to waive [his] rights, including those [Miranda rights] listed . . . above."

[16] The court of appeals stated that the provision of those warnings "contributes to our concern regarding the voluntariness of his confession." Vice, 392 Wis. 2d 754, ¶65. However, our case law indicates that it is the absence of Miranda warnings that weighs against voluntariness. State v. Hoppe, 2003 WI 43, ¶¶29, 56, 261 Wis. 2d 294, 661 N.W.2d 407 (in a noncustodial interview, absence of Miranda warnings were one of "certain behaviors of police [which] constituted coercive pressures brought to bear on [the suspect]").

26

controlling." <u>Wyrick</u>, 459 U.S. at 48.  In the absence of improper or coercive tactics, there is "simply no foundation for reaching a finding of involuntariness." <u>Clappes</u>, 136 Wis. 2d at 240.  As stated above, without any police coercion, and having considered all conditions of the interview, we are unconvinced that Vice's statements were not the product of a free and unconstrained will, reflecting deliberateness of choice.  Therefore, those statements were voluntary and the circuit court erred in granting Vice's motion to suppress.

## III. CONCLUSION

¶52  We conclude that the statements Vice made during his post-polygraph interview are admissible because:  (1) the interview was discrete from the polygraph examination; and (2) the statements were not the product of police coercion, and therefore were voluntary.  Accordingly, we reverse the decision of the court of appeals.

*By the Court.*——The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶53  ANN WALSH BRADLEY, J., withdrew from participation.

27

¶54 BRIAN HAGEDORN, J. *(concurring).* I agree with the majority that the polygraph and post-polygraph interview were discrete events and that Vice's statements were voluntary. I disagree with the court's attempt to explain and then reinforce an isolated and perhaps inartful sentence in Davis: "An important inquiry continues to be whether the [polygraph] result was referred to in order to elicit an incriminating statement." State v. Davis, 2008 WI 71, ¶42, 310 Wis. 2d 583, 751 N.W.2d 332. The majority contends that the court of appeals misunderstood this sentence, noting that it is followed by a citation to State v. Johnson, 193 Wis. 2d 382, 389, 535 N.W.2d 441 (Ct. App. 1995), where the issue was discreteness, not voluntariness. Majority op., ¶36 n.14. The majority then holds that whether the polygraph was referred to is in fact "important" to the discreteness analysis, but "is only one of many relevant factors to consider in determining voluntariness." Id.

¶55 In fairness to the court of appeals, the statement in Davis occurs in a section analyzing voluntariness, not discreteness. The discreteness discussion in Davis occurs and concludes in ¶¶23-34, while the "important inquiry" statement appears in ¶42, the final paragraph in the court's voluntariness discussion.[1] 310 Wis. 2d 583, ¶¶23-34, 42. It is not obvious to me that the court of appeals misread our opinion. If there was an error, it was in our opinion's imprecision.

---

[1] The paragraph concludes, "Accordingly, Davis's statement was voluntary." State v. Davis, 2008 WI 71, ¶42, 310 Wis. 2d 583, 751 N.W.2d 332.

1

¶56 My larger disagreement, however, is with the majority's resolution of this solitary sentence from Davis.

¶57 I agree with the majority's conclusion that, with respect to voluntariness, reference to polygraph results is merely one factor in a totality of the circumstances analysis. And I tend to think it is, at most, a relatively small factor. The question for voluntariness is coercion, and I do not see anything uniquely coercive with law enforcement references to inadmissible evidence during questioning. As the majority points out, if law enforcement can refer to non-existent evidence, I'm not sure why reference to inadmissible evidence is unusually problematic. See majority op., ¶45.

¶58 I part ways, however, with the majority's conclusion that reference to a polygraph is an "important" component of the discreteness analysis. Davis did not say this in its 12 paragraph discreteness discussion; Johnson never declares this either. Rather, Johnson describes the proper test as a totality of the circumstances analysis, and discusses this as just one factor among others. 193 Wis. 2d at 388-89. In practice, the majority opinion does exactly the same thing even though it embraces the "important inquiry" language. The majority concludes that temporal and spatial differences show the post-polygraph interview was a discrete event, and multiple references to the polygraph results in the interview do not change that. Majority op., ¶26. I agree wholeheartedly. The majority does not treat these polygraph references as an important inquiry for discreteness because here——and I suspect in most instances——it's not. In effect, the

2

majority attempts to make sense of an isolated sentence in Davis, and in doing so, subtly changes the law.

¶59 Rather than double down on one unclear phrase, we would do better to simply clarify and reinforce what I think the law has been up until this point: reference to the results of a polygraph, for both discreteness and voluntariness, is only one potentially relevant fact in a totality of the circumstances analysis. In this case, this fact has very little impact on either the discreteness or voluntariness analyses. For these reasons, I respectfully concur.[2]

---

[2] Other than ¶25 and footnote 14, I join the majority opinion.