# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00742-CR

---

**The State of Texas, Appellant**

**v.**

**Brandon James Cielencki, Appellee**

---

### FROM THE 433RD DISTRICT COURT OF COMAL COUNTY
### NO. CR2017-097, THE HONORABLE DIB WALDRIP, JUDGE PRESIDING

---

## C O N C U R R I N G   O P I N I O N

I join the majority and write separately to acknowledge an elephant in the room—the difficulty of discerning, and applying, the correct standard of review to a trial court's voluntariness decision when that decision is made from virtually uncontested facts apparent on a videotape of an interrogation.

"Constitutional and statutory confession claims are evaluated under the bifurcated standard set out in *Guzman v. State*, with questions of historical fact and questions that turn on credibility and demeanor being reviewed with deference to the trial court's ruling and application-of-law-to-fact questions that do not turn on credibility and demeanor being reviewed *de novo*." *Sandoval v. State*, 665 S.W.3d 496, 515 (Tex. Crim. App. 2022), *cert. denied*, 144 S. Ct. 1166 (2024).

Fair enough. But, in the voluntariness context, beyond questions regarding "who said what," what are issues of historical fact? "Is a person's understanding of words spoken by

another any different?  Is a person's reaction to a particular understanding of such words?"  George E. Dix & John M. Schmolesky, 41 Tex. Practice: Criminal Practice and Procedure § 18:76 (3d ed. 2011).  Suppose that a trial court watches a video of an interrogation and 1) finds the interrogating officer told the suspect both that he failed a lie detector test and that the lie detector test is infallible ("who said what"); 2) finds that the suspect understood the words spoken by the officer about the results and efficacy of the lie-detector test to be the gospel truth ("a person's understanding of words spoken by another"); and 3) finds that the suspect, as a result of that understanding, lost his powers of resistance or self-control ("a person's reaction to a particular understanding of such words").  The trial court then concludes that, under the totality of the circumstances, the confession was not "freely and voluntarily made without compulsion or persuasion."  Tex. Code Crim. Proc. art. 38.21.  Do we afford deference to the findings and review de novo the conclusion?  The standard answer is yes.  But doesn't the third finding control the conclusion?[1]

As you can see, the questions posed by the professors are good ones, and they do not find an easy answer in case law.  The Supreme Court of the United States—in resolving a circuit split on whether voluntariness of a confession is a fact or legal question—noted that "the appropriate methodology for distinguishing questions of fact from questions of law has been, to

---

[1] *See Culombe v. Connecticut*, 367 U.S. 568, 604–05 (1961) ("The second and third phases of the inquiry—determination of how the accused reacted to the external facts, and of the legal significance of how he reacted—although distinct as a matter of abstract analysis, become in practical operation inextricably interwoven.  This is so, in part, because the concepts by which language expresses an otherwise unrepresentable mental reality are themselves generalizations importing preconceptions about the reality to be expressed.  It is so, also, because the apprehension of mental states is almost invariably a matter of induction, more or less imprecise, and the margin of error which is thus introduced into the finding of 'fact' must be accounted for in the formulation and application of the 'rule' designed to cope with such classes of facts.  The notion of 'voluntariness' is itself an amphibian.  It purports at once to describe an internal psychic state and to characterize that state for legal purposes.").

say the least, elusive." *Miller v. Fenton*, 474 U.S. 104, 113 (1985). The *Miller* Court recognized a couple of guiding elemental principals—"that an issue involves an inquiry into state of mind is not at all inconsistent with treating it as a question of fact," and "an issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question"—but noted the "practical truth that the decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of allocation as it is of analysis." *Id*. at 113-14. And "the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Id*. at 114; *see also Villarreal v. State*, 935 S.W.2d 134, 139-141 (Tex. Crim. App. 1996) (McCormick, P.J., concurring) ("*Miller v. Fenton* should provide useful guidance to appellate courts in this State on how to characterize an issue as one of 'law' or 'fact.'").

Despite those elemental principals and that practical truth, the Court disagreed with the federal courts that had held that voluntariness of a confession is a "factual issue" entitled to a presumption of correctness on federal habeas review. *Miller*, 474 U.S. at 115. The *Miller* Court relied on:

- *stare decisis* (all its confession cases hold that the ultimate issue of voluntariness is a legal question);

- the unique legal dimension or hybrid quality of the voluntariness inquiry ("admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne");

- the fact that "assessments of credibility and demeanor are not crucial to the proper resolution of the ultimate issue of 'voluntariness,'"; and

3

- the elevated risk that the "erroneous resolution of the voluntariness question might inadvertently frustrate the protection of the federal right" given that "the critical events surrounding the taking of a confession almost invariably occur in a secret and inherently more coercive environment" and the "inevitable and understandable reluctance to exclude an otherwise reliable admission of guilt."

*Id*. at 115-18.[2]

The factors the Supreme Court relied upon to characterize constitutional voluntariness as a question of law may not apply with equal force to the state law question of voluntariness (at least those not based on police overreaching) where the question is whether the defendant's will was overborne—whatever the source. *See Oursbourn v. State*, 259 S.W.3d 159, 172 (Tex. Crim. App. 2008). That question can "involve the 'sweeping inquiries into the state of mind of a criminal defendant who has confessed'" that the Supreme Court of the United States found "are not of themselves relevant to due process claims." *Id*. (quoting *Colorado v. Connelly*, 479 U.S. 157, 166-67 (1986)).

In a very recent due process voluntariness case, the Court of Criminal Appeals, without explicitly saying so, reviewed the issue as one of law. *Ochoa v. State*, ___ S.W.3d ___, No. PD-0745-23, 2024 WL 4897416 (Tex. Crim. App. Nov. 27, 2024).

In *Ochoa*, the trial court had not made factual findings, but the parties did not ask for an abatement for them "because most of the relevant facts are contained in [Ochoa's] videotaped interview" so "the facts are largely uncontested." *Id*. at *11. The other relevant facts presumably came from motion to suppress hearing testimony from the ranger who conducted the

---

[2] Conversely (and confusingly), "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *see also Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011).

interview and the judge who provided the warnings. *See id*. at \*8. The Court thoroughly analyzed the videotaped interview of the juvenile suspect, including the midstream warnings, and disagreed with the trial court (and court of appeals) that the juvenile made the statement voluntarily. *Id*. at \*13-16. The "circumstances demonstrate that the conduct and statements by [the ranger], coupled with the inaccurate statements from [the judge] regarding [Ochoa's] rights, collectively operated to undermine Ochoa's free will and coerce him into confessing to these offenses." *Id*. at \*13. The Court cautioned that, "in considering the totality of the circumstances, courts should evaluate all the factors—the defendant's particular characteristics, the circumstances surrounding the interrogation, *and* law enforcement's conduct that may have been holistically coercive," rather than considering any factor in isolation which might "lead to an incorrect conclusion as to voluntariness." *Id*. at \*15.

Here too, the facts are largely uncontested. The trial court made findings, but those findings largely simply reiterated who said what—none of which was in dispute. Circling back to the professor's questions, the trial court did not make a finding that Cielencki understood the words spoken by Agent Upright and Detective Dufur—about the results of or the efficacy of the lie detector test—as true. But that inference seems critical to the trial court's legal conclusion that Cielencki's confession was not a free and unconstrained choice. Do we defer to that inference about Cielencki's understanding? Is that inference reasonable? Does it reflect a permissible view of the evidence? *See Kelly v. State*, 163 S.W.3d 722, 726 (Tex. Crim. App. 2005) ("deference must be given not only to a trial court's resolution of disputed facts, but also to the drawing of reasonable inferences from the facts" because "re-litigating the facts entails substantial costs with only a negligible contribution to accuracy"). Is the trial court better positioned than this court is to decide that issue? *See Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006) ("deferential

5

standard of review in *Guzman* applies to a trial court's determination of historical facts when that determination is based on a videotape recording admitted into evidence at a suppression hearing"). Do we defer to the additional inference that the trial court must have made, that Cielencki, because of that understanding, lost his powers of resistance or self-control? Or, again, is that a legal conclusion, one we review de novo?

Before *Ochoa*, the Court of Criminal Appeals decided *Carter v. State*, 309 S.W.3d 31 (Tex. Crim. App. 2010). The question in *Carter* was whether the defendant had voluntarily confessed even though the trooper asked him questions both before and after giving *Miranda* warnings. *Id*. at 32-33. The trial court found the pre-warnings questions inadvertent and held that the defendant made the statement voluntarily, but the court of appeals found the pre-warnings questions deliberate and the statement involuntary. *Id*. at 34-35. In coming to that holding, the court of appeals decided that "credibility and demeanor were not issues because 'the facts regarding the interrogation were preserved on videotape and are completely uncontroverted'" and had "reviewed the efficacy of the midstream warnings *de novo*." *Id*. at 40. The Court of Criminal Appeals found this to be the wrong approach because 1) under *Montanez*, "a trial court's determination of historical facts based on a videotape recording is still reviewed under a deferential standard," and 2) the trial court also saw and listened to the trooper testify *Id*. Therefore, a *de novo* review was inappropriate. Instead, a deferential standard of review applied to both the trial court's determination of whether the arresting officer's pre warnings questions were "inadvertent or intended to acquire an advantage in the interrogation process," and to its determination whether the statement was made voluntarily. *Id*. at 41-42.

Here, the trial court saw and listened to and even questioned Upright during the suppression hearing. Much of Upright's testimony related to the Texas Department of Public

Safety's polygraph policy manuals and quality assurance requirements—which were not in dispute. Upright stood by his representations in the interview that the lie detector test was infallible. He compared the test to a thermometer. The trial court made no explicit credibility findings. But some of the trial court's written "legal conclusions"—"Polygraph machines are inherently unreliable in determining deception and are a coercive interrogation tool[,]" and "Telling a person in a polygraph interrogation that they failed the test is *per se* coercive[,]"—support an inference that the trial court did not consider Upright's testimony credible. And that inference is reasonable given Texas's recognition that polygraph tests are unreliable. *See Leonard v. State*, 385 S.W.3d 570, 577 (Tex. Crim. App. 2012).

The varied approaches to the proper standard of review reflect the reality that the "cold" appellate record "had become warmer." *See* Judge Jack M. Sabatino, The Appellate Digital Deluge: Addressing Challenges for Appellate Review Posed by the Rising Tide of Video and Audio Recording Evidence, 96 Temp. L. Rev. 11, 40 (2023). Judge Sabatino remarked that the Supreme Court Justices' competing interpretations of the video evidence in *Scott v. Harris*, 550 U.S. 372 (2007) "exemplify that what an appellate jurist—or, for that matter, a juror or trial judge—may glean from such evidence sometimes will depend upon the eye of the beholder." *Id*. at 47. *Scott v. Harris* is not a voluntariness case; it is a qualified immunity case. But it shows that even the highest court struggles with the application of traditional standards of review when the chief event is captured on videotape.

There, a deputy attempted to stop a fleeing motorist by ramming the motorist's car from behind, causing the motorist to lose control of his vehicle, "which left the roadway, ran down an embankment, overturned, and crashed." *Id*. at 375. The motorist was badly injured and rendered a quadriplegic. *Id*.

7

The motorist filed a 1983 suit alleging a violation of his constitutional rights and the deputy filed a motion for summary judgment based on an assertion of qualified immunity. *Id*. at 375-76. The district court denied the motion, finding "material issues of fact on which the issue of qualified immunity turns which present sufficient disagreement to require submission to a jury," including whether the motorist was driving in such a fashion as to endanger human life. *Id*. at 376, 381. The court of appeals agreed with the denial, but the Supreme Court reversed. *Id*. at 376, 386.

The Supreme Court noted its responsibility to view the facts and draw reasonable inferences in the light most favorable to the motorist but noted an "added wrinkle" in the case: "existence in the record of a videotape capturing the events in question." *Id*. at 378. The majority found "it is clear from the videotape" that the motorist "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Id*. at 384. The lone dissenter, Justice Stevens, pointed out that the majority departed from the Court's "well-settled standard of review of factual determinations" made by the lower court and relied on a *de novo* review of the videotape, which, in any event, "does not reveal any incidents that could even be remotely characterized as 'close calls.'" *Id*. at 389-90, 392 (Stevens, J., dissenting).

Here, the video recording shows Cielencki appeared calm throughout the testing and interrogation. He never asked to leave. It is difficult to tell whether Cielencki, as the State argues, took advantage of the investigators' "minimized explanation" that he was "gradually remembering" events to avoid admitting he had lied to investigators or if Cielencki's responses were, as the trial court had to infer to reach the conclusion it did, genuine.

8

All that said, the trial court's finding of involuntariness was mainly based on Agent Upright and Detective Dufur's tactics. And other courts consider such tactics garden variety deception—not the type to render a suspect's statements involuntary.

Such was the case in *State v. Vice*, 961 N.W.2d 1 (Wis. 2021), where the Supreme Court of Wisconsin disagreed with the trial court (and the first level appellate court) that statements the defendant Vice made during a post-polygraph interview were involuntary. *Id*. at 5, 16-17. The investigator in that case met with Vice regarding a child's sexual assault outcry. *Id*. at 5. Vice denied wrongdoing and asked if there was anything he could do to clear his name. The investigator suggested that he take a polygraph examination. Vice voluntarily took the examination seven days later. The examination lasted nearly two hours and during that time, the detective never raised his voice, threatened, or made any promises to Vice, and Vice made no admissions of wrongdoing. *Id*. at 6.

Vice was then escorted to a separate interview room. During a 45-minute interview, the investigator and detective made at least 11 references to Vice's failed polygraph results. *Id*. Vice, after the ninth reference, stated, "I'll admit that I must have did it because obviously the test says that I did it, but I don't physically remember." *Id*. at 7. During the interview, neither officer raised his voice, used a hostile tone, or made any threats, promises, or inducements. *Id*. After the interview, Vice was driven home. *Id*. Vice filed a motion to suppress as involuntary all the statements he made during his interview, arguing that the tactics used in that interview were coercive because the officers repeatedly told him he failed the polygraph examination before getting the statement they wanted. *Id*. at 8.

The trial court agreed, finding "the State made a number of references to a failed polygraph," creating a "coercive environment" which was "the fatal flaw in the totality of the

9

circumstances[.]" *Id.* The first level appellate court affirmed. *Id.* at 8-9. But the Supreme Court of Wisconsin, applying its two-part "*Davis* test," reversed. To be admissible under that test, 1) the post-polygraph interview must be a discrete event from the polygraph examination; and 2) the post-polygraph statements must be voluntary under ordinary constitutional due process considerations. *Id.* at 10.

The court found the post-polygraph interview to be a discrete event (it took place fifteen minutes later in a separate room) but found no police coercion. The court addressed the factors that the lower court had relied on to find involuntariness including two that ring familiar here: 1) "the officers' use of statements that the polygraph examination showed that Vice remembered the assault" and 2) "the officers' failure to correct Vice's 'stated misunderstanding' that 'I'll admit that I must have did it because obviously the test says that I did it, but I don't physically remember.'" *Id.* at 14-15. The higher court rejected the lower court's conclusion that the action and inaction constituted coercion. First, "[t]he officers' insistence that Vice's reactions during the polygraph examination indicated that he *did* remember were simply another way of characterizing those results. And even if we assume without deciding that those statements were outright falsehoods, they would not rise to the level of coercion absent being coupled with some other, more coercive practice used on a particularly vulnerable suspect." *Id.* at 14-15. Rather, the statements were consonant with the types of deception that are common and accepted police practice. *Id.* at 15. And second, "interrogators have no absolute duty to inform a suspect during a post-polygraph interview that polygraph examinations are fallible" and "the officers were not required to believe Vice's claims that he did not remember, and it was not coercive for them to question those claims during the interview" given the absence of "evidence in the record to indicate

10

whether or not Vice was being truthful." *Id*. *Vice* is not an outlier. *See* David L. Faigman et al, 5 Mod. Sci. Evidence § 38:9 (2024-2025 Ed.)

Although Vice's interview mirrored that of Cielencki's, there is a key factual difference: Vice made his first incriminating statements only eight minutes into the discrete interview. *Vice,* 961 N.W.2d at 7. Cielencki made his first incriminating statements six and half hours into the combined test/interview. And there is a key legal difference: due process level coercive or improper police conduct is a prerequisite for a finding of involuntariness in Wisconsin. *Id*. at 13. Since the Wisconsin court found no due process level coercion, it did not engage in the balancing test between Vice's personal characteristics (his age, intelligence, physical and emotional condition, and prior experience with law enforcement) and the pressures imposed upon him by the police. Here, the trial court found coercive or improper police conduct and, presumably, engaged in the balancing test between Cielencki's personal characteristics and that coercive pressure.

Given our obligation to defer to the inferences the trial court must have made about Cielencki's state of mind if they reflect a permissible view of the evidence (regardless of whether we agree with it), and the fact that involuntariness under state law is not dependent on due process level overreaching, I join the majority opinion. I am still unsure of how, in this context, to distinguish between questions of fact to which we owe the trial court deference, and questions of law. But I am fairly sure, after reviewing the video, that if Cielencki's will was overborne, he did not know it.

11

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne and Justices Kelly and Theofanis

Filed:   January 9, 2025

Publish